GEORGE KAONIS, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Kaonis v. Commissioner
Docket No. 172-76.
United States Tax Court
T.C. Memo 1978-184; 1978 Tax Ct. Memo LEXIS 332; 37 T.C.M. (CCH) 792; T.C.M. (RIA) 780184; May 17, 1978, Filed George Kaonis, pro se. Timothy L. Nelson, for the respondent. SCOTT
MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency of $1,825.84 in petitioner's Federal income tax for 1972. The issues for decision are: (1) Whether certain residential property owned by petitioner was community property at any time during 1972; (2) whether petitioner received rent from that property totaling $330 in 1972; (3) whether all or any part of expenditures made by petitioner in 1972 for refurbishing the residential property were currently deductible by him for that year; (4) the *334 proper basis of petitioner's residential property for the purpose of depreciation and whether he is entitled to a depreciation deduction for the full year 1972; (5) whether petitioner may deduct his adjusted basis in one component of his residential property as loss on its retirement; and (6) the proper amount, if any, of petitioner's deductions for education expenses, work clothing, tools, charitable contributions and casualty loss. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner filed an individual Federal income tax return for calendar year 1972. At the time of filing his petition in this case, he resided in San Diego, California. Prior to 1966, petitioner married Rita Kaonis. They separated in April 1969, and on June 19, 1969, Rita Kaonis filed for divorce in the Superior Court of the State of California, for the County of San Diego. A Final Judgment of Dissolution of Marriage was entered in the case on June 2, 1972. Subsequent to the separation, petitioner met Mary Ruth Morgan. They were married in August 1973. In 1966, during his first marriage, petitioner and Rita Kaonis purchased a house in San Diego, for *335 use as their personal residence. They paid $1 as downpayment, and assumed a mortgage of $21,900. They lived at this house together until April 1969 when Rita Kaonis moved out. Petitioner continued to reside there until August 1970 when he was transferred to the San Francisco area by his employer. Petitioner rented the house from September 1970 to March 1, 1972. The rent was $165 per month. In 1967, the master bedroom of the house was enlarged. In 1971, the backyard was excavated for construction of a patio and an apartment. The cost of these improvements was approximately $1,730. The house and certain other marital property were the subject of a property settlement executed by petitioner and Rita Kaonis in connection with their final judgment of divorce. The pertinent parts of this settlement are set forth below: 5. The respondent hereby transfers to petitioner as her sole and separate property the furniture, furnishings and fixtures, which have heretofore been the community property of the parties. 6. The petitioner hereby transfers to respondent as his sole and separate property the real property located at 5655 Lone Star Drive, San Diego, California, which has *336 heretofore been the community property of the parties, and which real property is more particularly described as follows: Lot 208 of San Carlos West, Unit No. 2, in the City of San Diego, County of San Diego, State of California, according to Map thereof No. 5401, filed in the Office of the County Recorder of San Diego County, June 5, 1964. Petitioner shall forthwith sign a Quitclaim Deed to said real property in favor of respondent. 7. The respondent hereby transfers to petitioner as her sole and separate property the 1961 Oldsmobile automobile, which is presently in her possession and which automobile has heretofore been the community property of the parties. 8. Respondent hereby agrees to pay to petitioner as and for her community interest in the real property of the parties the sum of $5,000.00 by signing a Note and Trust Deed to said real property in favor of petitioner. Said sum of $5,000.00 shall be paid from respondent to petitioner at the rate of $125.00 per month, commencing as of the date of entry of the Interlocutory Judgment and continuing at equal monthly periods thereafter for a period of forty months. The quitclaim deed to petitioner's San Diego residence, *337 required by paragraph 6 of the settlement, was executed on May 24, 972, by Rita Kaonis in favor of "GEORGE KAONIS as his sole and separate property." The furniture mentioned in the settlement was left in petitioner's San Diego residence after his separation from Rita Kaonis.It was used by petitioner until he moved to San Francisco in September 1970. Thereafter, it was stored in the garage of the San Diego house until the fall of 1971, when it was removed by Rita Kaonis. After the tenant moved out of petitioner's San Diego house on March 1, 1972, petitioner decided that substantial refurbishing and additions were appropriate. Numerous expenditures were made during 1972 in connection with the renovation. Various appliances and fixtures were repaired or replaced. Walls were painted. Paneling and cabinets were replaced or refinished. Tile was installed, and curtains were purchased. Petitioner had a patio, gate and fence constructed. [1] *338 Upon regaining possession of the property in 1972, petitioner discovered that the water softener which had been acquired in 1968 at a cost of $270 had become clogged with sand and was beyond repair. It was removed in 1972 but was not replaced until 1973. It has never been discarded. Also in 1972, a number of articles were stolen from petitioner's garage. [2]
During 1972, petitioner made approximately 26 trips from his place of employment in San Francisco to San Diego. On these trips he stayed at the apartment of his fiancee Mary Ruth Morgan. On all of these trips he visited his house to examine the work *339 performed and on some occasions to work on it himself. In 1972, petitioner gave to Goodwill Industries a television set, two couches and a chair which had a total fair market value of $120. He also purchased 15 professional books and catalogues at a cost of $185.88, some of which were directly related to his employment, numerous tools and pieces of equipment related to his employment which cost $172, and certain clothing, including a hard hat which cost $12 that he used in his employment. Except for the hard hat, the clothing was of the type usable in petitioner's personal activities and most of it was so used. On his tax return for 1972, petitioner did not report any receipt of rental income. He deducted $880 as depreciation on his San Diego house, calculated by applying the straight line method to a stated basis of $17,600 for the building and by using a useful life of 20 years. He had allocated $9,000 to the land and noted "Rental Improve. 1-71 1000-." Petitioner also deducted $4,400 as repairs and vandalism loss, and $1,586 as cost of overseeing, both with respect to the San Diego house. Finally, petitioner deducted $200 as charitable contributions, $250 for small tools *340 and supplies, $100 for special clothing, and $210 [3] as education expense. In his notice of deficiency to petitioner, respondent disallowed the deductions for expenses of $4,400 and $1,586 and for depreciation of $880 relating to the San Diego house, because petitioner failed to show that these "resulted from a transaction entered into for profit or [were] incurred in a trade or business" and because the expenditures were unsubstantiated and, if made, were capital in nature. Respondent also disallowed the deductions for charitable contributions and employee business expenses because of lack of substantiation and because the clothing included therein was not of a type for which deduction is allowed. By amendment to his answer respondent has further asserted that petitioner received $330 of rental income in 1972. OPINION We first address the issue of ownership of petitioner's San Diego house. Both parties recognize that the house, acquired during petitioner's first marriage, was originally held as community property. However, petitioner claims that the house was owned by him as *341 his separate property after 1969 and was not community property at any time during 1972. Respondent asserts that the house remained community property until Rita Kaonis executed a quitclaim deed of the property to petitioner on May 24, 1972. Petitioner's argument is based on an oral agreement with his first wife made at the time of their separation in 1969. Under California law, a husband and wife can transmute community property to separate property by oral agreement, and petitioner claims to have done so here. See Woods v. Security First National Bank,46 Cal. 2d 697, 701, 299 P. 2d 657, 659 (1956). However, on this record, we find that the agreement reached in 1969 provided only for the future division of the marital property and was not intended by the parties to effect a transmutation of the property prior to their divorce. Under the 1969 oral agreement between petitioner and his first wife, petitioner was to keep the house and Rita Kaonis was to take the household furnishings. Furthermore, Rita Kaonis was to receive in cash one-half of the couple's equity in the house determined at the time of final divorce. The record shows that petitioner retained *342 the household furnishings for as long as he lived in the house. Having no use for them after he moved to San Francisco, petitioner stored them in the garage until they were removed by Rita Kaonis in 1971. Although Rita Kaonis permanently vacated the house in April 1969, her interest did not terminate at that time. Since the amount she was to receive as a property settlement was to be determined by the fair market value of the house at the time of the divorce, she bore her full share of appreciation or depreciation until that date. Furthermore, there is no evidence that any other burdens or benefits of ownership, other than possession of the property, were shifted by the oral agreement. The deed to the property was not executed by Rica Kaonis until May 24, 1972, about the time of the final decree of divorce. These facts raise an inference that the parties to the oral agreement did not intend for the ownership of the house and furnishings to shift at the time of the agreement, but only at a later date, that of the final divorce. The settlement agreement executed by petitioner and Rita Kaonis in connection with the final decree of divorce refers to the house, furnishings and other *343 marital property as property "which has heretofore been the community property of the parties." On this record, we find that this agreement was executed contemporaneously with the deed to petitioner on May 24, 1972. Thus, as late as that date petitioner and Rita Kaonis still regarded the San Diego house as their community property. In our view, the record establishes that by oral agreement in 1969, petitioner and Rita Kaonis agreed only to the nature of a future property settlement and to the possession of the property in the interim. They intended no immediate transmutation of the house to separate property. We find that petitioner's San Diego house remained community property until the deed was executed by Rita Kaonis on May 24, 1972. We therefore hold that all items of income and deduction with respect to the house incurred prior to that date must be allocated equally between its two owners. Regarding rent for the house in 1972, we find that petitioner received a total of $330 as rent in January and February of 1972. There is credible evidence that this amount was paid during those months, and only an absence of notation in petitioner's records can be said to indicate that *344 it was not. Respondent has asserted that the house owned by petitioner and Rita Kaonis during 1972 was not property held for the production of income or in a trade or business within the meaning of sections 162, 167 or 212, I.R.C. 1954, [4] after February 1972. He claims that the intention to rent the residence was abandoned at that time. Petitioner contested this assertion and testified credibly that throughout 1972 he intended to rent the house again.
The evidence supports petitioner. Except for a temporary assignement in April, petitioner was employed throughout 1972 in an area far removed from San Diego. The duration of his assignment to that area was not known, and petitioner believed it might last several years. Although he visited San Diego frequently in 1972, petitioner never stayed at his house. Finally, petitioner contacted a real estate agent in March 1972 concerning the possibility of renting the house after the repairs were completed. We find on this record that throughout 1972 petitioner never abandoned his intention to rent the house, and therefore *345 he is entitled to appropriate deductions for expenses and depreciation. Petitioner attempted to deduct currently on his 1972 return all the expenditures he made with respect to his home in 1972. [5] Our examination of the record, however, reveals that these expenditures were in large part capital in nature, not eligible for current deduction. See section 1.162-4, Income Tax Regs. Many of the expenditures were for additions to the existing structure, such as the patio, fence, gate, floor tile, widow treatments, paneling, and light fixtures. These expenditures clearly added to the value of the property and were not made to restore it to its previous condition. Therefore, we find that these expenditures may not be deducted currently in 1972 but must be capitalized and added to petitioner's basis. Furthermore, many expenditures were made for replacements of items in the house which had the effect of arresting deterioration and prolonging the life of the property. This class of expenditures includes bathroom fixtures and wash basins, tile, a stove, and certain other items. However, some expenditures simply restored the property to its previous condition *346 without either adding to the value of the property or prolonging its life. Included in this class are painting, cleaning and certain repairs to the property. Respondent asserts that all of the expenditures were capital in nature because made as part of a plan of total renovation. However, the cases cited for this proposition are factually dissimilar from those here. Here, the property was tenantable and generally suitable for its use in the trade or business. The repairs and additions here were not part of a plan of total rehabilitation such as those contemplated in Stoeltzing v. Commissioner,266 F.2d 374 (3d Cir. 1959), affg. a Memorandum Opinion of this Court and Bloomfield Steamship Co. v. Commissioner,33 T.C. 75 (1959), affd. per curiam 285 F.2d 431 (5th Cir. 1961). Having examined the evidence of the expenditures and their amounts, we find that the amount of expenses currently deductible in 1972 and paid before May 24, 1972 was $664.36, and that *347 the amount paid after May 24, 1972 was $1,091.81. Furthermore, we find that $2,704.77 of the expenditures may be added to the basis of the property. Of these latter expenditures, $5.57 was paid about March 1, 1972, $8.50 was paid about April 1, 1972, $295.77 was paid about May 1, 1972, $66.15 was paid about June 1, 1972, $1,017.60 was paid about July 1, 1972, $935.28 was paid about August 1, 1972, $177.03 was paid about September 1, 1972, and $198.87 was paid about December 1, 1972. Petitioner also deducted $1,586 as cost of overseeing the refurbishing of his house in 1972. He computed this figure by multiplying the estimated number of trips he made to San Diego in 1972 by the round trip fare from San Francisco, including taxi fares. Aside from the question of substantiation of these expenses, petitioner is not entitled to deduct them. In our view, petitioner's principal purpose in making these trips was to visit his fiancee. We find that conduct of activity related to his house was no more than an incidental purpose of the trips and that they were essentially personal in nature. Therefore, no expenses such as those described by petitioner may be deducted in 1972. Section *348 262; cf. Mazzotta v. Commissioner,57 T.C. 427 (1971), affd. per curiam 465 F.2d 1399 (2d Cir. 1972). In addition to the amounts above that we found to be added to thebasis of the house in 1972, the parties do not otherwise agree on the amount of the adjusted basis for the purpose of depreciation. The record shows that the initial basis of the property, land and building, was $21,900. Yet petitioner reported a total adjusted basis of $26,600 on his 1972 return. Eptitioner allocated $9,000 of this amount to land, and respondent has not challenged this allocation. Thus, accepting petitioner's allocation of $9,000 to the land, a difference of $4,700 appears between petitioner's initial basis for the building and that reported by him on his 1972 return. The record shows that three improvements were made to the property by petitioner prior to 1972. A water softener was installed in the house in 1968, the master bedroom was enlarged in 1967, and the backyard was excavated in 1971 for the construction of a patio and an apartment. Having carefully examined the record, we find that the cost of these improvements totalled $2,000, and that that amount *349 was properly added by petitioner to his basis. [6] However, other than this amount and the amounts expended for improvements in 1972, described above, petitioner has not established that any other expenditures have been made that properly should be added to his basis for the property in 1972. Petitioner took depreciation on his house as a whole and did not account for its components separately. He computed depreciation from the time of its conversion to rental property in September 1970 through the year in issue using the straight line method and a 20-year useful life. Respondent has not challenged petitioner's method of computation in this regard. In his reply brief petitioner for the first time claimed the benefits of an increased depreciation rate and method and an investment credit for items purchased in 1972. We do not reach the substance of these assertions, because they are clearly untimely. Respondent has had no opportunity to respond to these new issues, and they are not properly before us. See Aero Rental v. Commissioner,64 T.C. 331, 338 (1975); *350 Messer v. Commissioner,52 T.C. 440, 455 (1969), affd. 438 F.2d 774 (3d Cir. 1971). When he regained possession of the house in March 1972, petitioner discovered that one of its components, the water softener, was inoperative and beyond repair because it was clogged with sand. It had no value at that time. Although petitioner originally attempted to deduct $270 as a casualty loss with respect to the water softener, he has subsequently claimed that amount as loss on the retirement of depreciable property.
Where depreciable property is permanently withdrawn from use in a taxpayer's trade or business or in the production of income, the regulations under section 167 provide for recognition of loss under certain circumstances. [7]
*351 Respondent asserts that petitioner did not physically abandon the water softener in 1972, noting that petitioner still has parts of the equipment in his possession. However, in our view, the record establishes that petitioner withdrew the water softener from operation believing it to be totally worthless and of no further use. Only certain parts appear to have been retained, and these appear to be refuse. It is clear from the record that petitioner intended never to use any part of the water softener again. We find that petitioner physically abandoned the property in 1972 within the meaning of the regulation. See United California Bank v. Commissioner,41 T.C. 437, 451 (1964), affd. per curiam 340 F.2d 320 (9th Cir. 1965). Therefore, recognition of loss is allowable, measured by petitioner's adjusted basis in the water softener at the time of retirement. Under section 1.167(a)-8(c), Income Tax Regs., the adjusted basis used for measuring petitioner's loss on the water softener, is its basis under section 1011 adjusted as if it had been depreciated in a single asset account using the method petitioner employed for *352 the multiple asset account but with a useful life equal to the maximum expected useful life of the water softener. Only scant evidence of cost, useful life, or value at the date of conversion to business use was produced by petitioners. See section 1.167(g)-1, Income Tax Regs. The water softener was purchased in 1968 and carried a 5-year warranty. It was converted to business use in September 1970 and was withdrawn from service in March 1972 when totally inoperative. After examination of the record, we find that petitioner's adjusted basis for the purpose of deducting a retirement loss on the water softener was $75. Petitioner's deduction is limited to that amount. Several items were stolen from the garage of petitioner's San Diego house in 1972. It appears from the record that no prospect of recovery existed. Some of these items were purchased for use in connection with the rental property but had not been installed. These items are deductible, without regard to the limitation of section 165(c)(3), at their adjusted bases, which we find totaled $162. Other items appear to have been petitioner's individual property without any connection with *353 the house or its operation as rental property. Since theft of these items is subject to the limitation of section 165(c)(3) and the adjusted bases of these items totals only $85, no deduction is allowable for loss of these items. Petitioner donated certain items to Goodwill Industries in 1972. Petitioner is entitled to a deduction under section 170 for the value of these items, which we find from the record to be $120. Petitioner claimed a deduction for certain expenditures claimed to be business expenses. Petitioner spent $185.88 on professional books. In our view, some of these books related directly to petitioner's activities as an employee and had no useful life extending beyond 1972. The useful life of others is not determinable from this record. After careful examination, we find $65 of the amount expended for books to be deductible in 1972. Petitioner also purchased certain equipment and tools in 1972 for use in his employment in San Francisco. We find that the total cost of these items was $172. Petitioner had no use for these items other than on the San Francisco project. On the facts of this case we find that the cost of these items, $172, is currently deductible *354 by petitioner in 1972. Finally, petitioner has claimed a deduction for clothing that he purchased in 1972 and wore to work. Except for a helmet that we find cost $12, all of this clothing was suitable for wear by petitioner in his personal activities and most of it was in fact worn by him in such activities. We find that only $12 is deductible by petitioner in 1972 for clothing necessary for use in his trade or business. Decision will be entered under Rule 155. Footnotes
1. The following is the list of the items claimed by petitioner to be repairs and improvements to the house: Item
Amount
Room deodorizers
$ 2.17
Cleaning supplies, including rug shampoo
54.91
Rug shampoo
7.78
Rug shampoo machine rental
4.00
Floor wax, cleaning agents for floor, wood
paneling cleaner
47.34
Painting inside house - master bedroom
35.00
Painting inside house - master bedroom
5.51
Painting inside house - rest of house
102.28
Painting of ceilings throughout house
200.00
Misc. paint supplies
45.81
Paint
5.67
Paper drop cloths
2.60
Drop cloth
6.98
Paint rollers and brushes
21.91
Paint thinner
2.80
Kitchen curtains
9.15
Drapes for 2 bedrooms
65.50
Picture for hallway
14.69
Curtain rod and misc.
3.27
Drapery cleaning w/storage
112.70
Floor tile
100.00
Front outdoor light fixtures
26.84
Stove replacement
66.15
Dishwasher overhaul - parts and cleaner
6.50
Oven parts
8.87
Toilet seat
2.93
Misc. supplies (Sears)
44.08
Tile cutter rental
8.50
Installation of tile - kitchen and bath
200.00
Tile for above
73.00
Bolts and misc. hardware
2.95
Saw blades
7.85
Misc. hardware
6.30
7-inch steel wire wheel
2.09
Supplies for repair
7.24
Tar
$ 2.99
Garage door springs
5.57
Hardware for doors and cabinets
27.28
Silicon seal
9.38
Plumbing supplies for kitchen
11.84
Patio
Lumber for patio
177.03
Lumber for patio
399.90
Supplies for patio and other
62.44
Shingles for patio
189.52 Of this amount, $18.90 appears to have been paid in 1973. ** This item was paid in 1973.
*↩
Shingles for patio
12.27 **
Gate and Fence
Concrete for gate and fence
4.16
Lumber for gate and fence
7.85
Lumber for gate and fence
186.86
Misc. small receipts
99.88
Other Items
Misc. hardware for kitchen cabinets
10.77
Finished paneling in living room
60.00
Bathroom fixtures (3)
45.00
2 new wash basins
40.00
Outside lights - casings and bulbs
23.00
Insect spray for yard
5.00
Patio lamps (2)
30.00
Locks for patio wall
50.00
Bricks for patio wall
45.00
Cement for patio wall
5.00
Redwood for patio wall
68.00
Patio wall labor
150.00
Patio construction labor - approx.
490.00
Fence and gate construction labor - approx.
60.00
Repairs in house - labor
900.00
2. Petitioner's list of these items is as follows: ↩
Estimated Item
Value
Copper fittings in bucket from garage $50
Paint rollers from garage
5
Ironing board
17
Fireplace blower (imported)
45
Shelf and mirror from hallway
25
Four roll chrome towel dispensers
12
Lazy Susan
3
Wood sink covers
10
Canned goods from garage
20
Kitchen curtains
10
All light bulbs in house (approx. 30)
15
Shower curtain and chrome rod from lg. bath
35
3. Petitioner claimed this amount as expenditures for professional books and catalogues.↩
4. All statutory references are to the Internal Revenue Code of 1954, as amended.↩
5. The record shows that some of the expenditures claimed as deductions by petitioner were made in 1973. Petitioner is clearly not entitled to deduct these amounts in 1972.↩
6. A proper adjustment will be required because of our holding infra↩ with respect to the abandonment of the water softener.
7. Section 1.167(a)-8 provides in part: Sec. 1.167(a)-8. Retirements.--(a) Gains and losses on retirements. For the purposes of this section the term "retirement" means the permanent withdrawal of depreciable property from use in the trade or business or in the production of income. The withdrawal may be made in one of several ways. For example, the withdrawal may be made by selling or exchanging the asset, or by actual abandonment. In addition, the asset may be withdrawn from such productive use without disposition as, for example, by being placed in a supplies or scrap account. The tax consequences of a retirement depend upon the form of the transaction, the reason therefor, the timing of the retirement, the estimated useful life used in computing depreciation, and whether the asset is accounted for in a separate or multiple asset account. Upon the retirement of assets, the rules in this section apply in determining whether gain or loss will be recognized, the amount of such gain or loss, and the basis for determining gain or loss: * * *
(4) Where an asset is retired by actual physical abandonment (as, for example, in the case of a building condemned as unfit for further occupancy or other use), loss will be recognized measured by the amount of the adjusted basis of the asset abandoned at the time of such abandonment. In order to qualify for the recognition of loss from physical abandonment, the intent of the taxpayer must be irrevocably to discard the asset so that it will neither be used again by him nor retrieved by him for sale, exchange, or other disposition. * * *
(b) Definition of normal and abnormal retirements. For the purpose of this section the determination of whether a retirement is normal or abnormal shall be made in the light of all the facts and circumstances. In general, a retirement shall be considered a normal retirement unless the taxpayer can show that the withdrawal of the asset was due to a cause not contemplated in setting the applicable depreciation rate. For example, a retirement is considered normal if made within the range of years taken into consideration in fixing the depreciation rate and if the asset has reached a condition at which, in the normal course of events, the taxpayer customarily retires similar assets from use in his business. On the other hand, a retirement may be abnormal if the asset is withdrawn at an earlier time or under other circustances, as, for example, when the asset has been damaged by casualty or has lost its usefulness suddenly as the result of extraordinary obsolescence. (c) Basis of assets retired. The basis of an asset at the time of retirement for computing gain or loss shall be its adjusted basis for determining gain or loss upon a sale or other disposition as determined in accordance with the provisions of section 1011 and the following rules: * * *
(2) In the case of a normal retirement of an asset from a multiple asset account in which the depreciation rate was based on the maximum expected life of the longest lived asset in the account, the adjustment for depreciation allowed or allowable shall be made at the rate which would have been proper if the asset had been depreciated in a single asset account (under the method of depreciation used for the multiple asset account) using a rate based upon the maximum expected useful life of that asset, and (3) In the case of an abnormal retirement from a multiple asset account the adjustment for depreciation allowed or allowable shall be made at the rate which would have been proper had the asset been depreciated in a single asset account (under the method of depreciation used for the multiple asset account) and using a rate based upon either the average expected useful life or the maximum expected useful life of the asset, depending upon the method of determining the rate of depreciation used in connection with the multiple asset account. * * *↩