Jerome S. **MOSS, Sandra Moss, Sharon M. Alesia, Herb Alpert, and Lani Alpert, Petitioners-Appellants,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.**

No. 86–7398.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 1, 1987.

Decided Oct. 28, 1987.

John C. Fossum, Newport Beach, Cal., for petitioners-appellants.

Roger M. Olsen, Washington, D.C., for respondent-appellee.

Before SCHROEDER, ALARCON and NELSON, Circuit Judges.

NELSON, Circuit Judge:

By this appeal, Jerome and Sandra Moss, Sharon Alesia, and Herb and Lani Alpert ("taxpayers") challenge the tax court's holding in *Moss v. Commissioner*, 51 T.C.M. (CCH) 742 (1986), that the taxpayers must capitalize certain normally deductible repair expenses totaling $270,268 because the expenses were incurred in conjunction with an overall plan of capital improvements to a hotel. The parties have stipulated to most of the relevant facts, and the taxpayers do not contest the tax court's findings of other facts. We note jurisdiction under 26 U.S.C. § 7482 (1982) and reverse.

**FACTUAL BACKGROUND**

The taxpayers are general and limited partners in Almo Hotel Company, Ltd. ("Almo"), a California limited partnership. In 1976, the tax year in question, Almo was

---

the sole fee owner of the Hyatt House Hotel ("the Hotel"), located near the Los Angeles International Airport. The Hotel was constructed in 1963 and was known as the International Hotel prior to 1975. It is a thirteen-story, reinforced concrete building with approximately 620 guest rooms, two large restaurants, two cocktail lounges, a large ballroom, more than a dozen smaller conference rooms, and numerous retail stores. The Hotel was purchased in 1967 for $12,600,000 by Almo Enterprises, a California limited partnership having the same partners as Almo, and was transferred to Almo in 1975. The purchase price included the acquisition of the Hotel land and buildings only, and the furnishings, equipment, and supplies used in operating the Hotel were supplied and owned by the Hotel's tenant. At all relevant times, Almo leased the Hotel land and buildings under a master lease to Ariz, a California limited partnership. For management purposes, Ariz in turn subleased the Hotel to Airportel, Inc. ("Airportel"). Prior to 1975, Airportel's management performance was guaranteed by its then-parent corporation, International Airport Hotel Systems, Inc. ("IAHS"). As an IAHS subsidiary, Airportel operated the Hotel under a triple-net lease and was responsible for all repairs and maintenance, as well as for purchasing and replacing the furniture, fixtures, equipment, and machinery necessary to operate the hotel.

Prior to 1975, the American Automobile Association ("AAA") consistently assigned the Hotel an "excellent" rating.[1] Because hotels operate twenty-four hours a day, 365 days a year, they are continuously in need of maintenance work and refurbishing. A first-class hotel must therefore make repairs and replace furniture, furnishings, and equipment on an ongoing basis pursuant to an annual plan and budget. However, owing to financial difficulties encountered by Airportel and IAHS, part of the Hotel's normally ongoing program of capital replacements and repairs was deferred during the early 1970's. As a consequence, the Hotel's AAA rating slipped one level from "excellent" in the 1974/1975 AAA Tour Book to "very good" in the 1975/1976 AAA Tour Book.

In 1975, Almo and Ariz released IAHS from its guarantor responsibilities in return for all of Airportel's stock and some cash and notes. Almo and Ariz then sought new management for the Hotel and negotiated with both Hilton Corporation ("Hilton") and Hyatt Corporation ("Hyatt"). Owing to Airportel's deferral of some repairs and capital replacements during the preceding two or three years, both Hilton and Hyatt recommended that approximately $2,000,000 in capital improvements and repairs be made to the Hotel.

In August 1975, Airportel (now owned by Almo and Ariz) entered into a written management agreement with Hyatt. Pursuant to the terms of the management agreement, Airportel agreed to spend up to $2,000,000 on capital improvements and repairs to be proposed later by Hyatt. In turn, Hyatt agreed to finance these improvements and repairs to the Hotel by lending $2,000,000 to Airportel. Due to concerns that the newly-acquired Airportel stock might be subject to unknown liabilities, Almo and Ariz formed a California joint venture called Almo/Ariz for the purpose of accepting Hyatt's loan and carrying out the improvements and repairs.

The capital improvements and repairs were commenced in November 1975, and were completed in 1976, with the Hotel continuing to operate throughout that period. About 400 of the Hotel's 620 guest rooms underwent both a "hard remodel" (beds, chairs, tables, and lamps) and a "soft remodel" (new carpeting, drapes, and bedspreads). Additionally, most of the Hotel's public areas were remodeled. The foregoing capital improvements cost a total of $1,486,915.[2] Almo/Ariz capitalized these

---

1. Prior to 1977, the AAA rated hotels under five categories: fair, good, very good, excellent, and outstanding. After 1977, the AAA began rating hotels under a system of one to five stars, with five stars being the equivalent of "outstanding" under the previous rating system.

2. Almo/Ariz capitalized the following improvements financed by the Hyatt loan:

improvements pursuant to 26 U.S.C. § 263(a)(1) (1982), depreciated the cost over a seven-year useful life, and leased the improvements to Airportel.[3] The Commissioner has not challenged the tax treatment of the foregoing expenditures.

In conjunction with the remodeling, Almo/Ariz also spent about $400,000 of the Hyatt loan on repairs and maintenance work, including the repainting and repapering of the remodeled guest rooms and public areas. Pursuant to 26 U.S.C. § 162(a) (1982), Almo/Ariz treated the expenditure as an ordinary and necessary repair expense, deducting from its income $132,140 in 1975 and $270,268 in 1976.

The $270,268 deducted by Almo/Ariz in 1976 is the subject of this appeal.[4] Portions of the $270,268 flowed through Almo/Ariz and Almo to the taxpayers, who deducted their proportionate shares on their personal income tax returns for 1976. However, the Commissioner assessed deficiencies against the taxpayers, claiming that the $270,268 should have been capitalized and depreciated over the Hotel structure's remaining thirty-year useful life. In the taxpayers' appeal to the tax court, the Commissioner conceded that "the particular items deducted by Almo/Ariz as repairs 'were of the *type* (i.e., painting, wallcovering, etc.) of items that normally qualify as repair expense items.'" *Moss*, 51 T.C.M. (CCH) at 746. However, the tax court held in favor of the Commissioner, finding that the repairs were made in conjunction with a plan of capital improvements to the Hotel property and were thus required to be capitalized. *Id.* at 747.

## THE PLAN OF REHABILITATION DOCTRINE

Generally speaking, expenditures for ordinary and necessary repairs may be de-ducted in the year incurred, while expenditures for permanent improvements or betterments made to increase the value of any property must be capitalized and depreciated over the useful life of the improvement. *See* 26 U.S.C. §§ 162(a), 263(a)(1) (1982).[5] The often-litigated distinction between repair expenses and capital improvements has been characterized as the difference between "keeping" and "putting" a capital asset in good condition:

> The test which normally is to be applied is that if the improvements were made to "put" the particular capital asset in efficient operating condition, then they are capital in nature. If, however, they were made merely to "keep" the asset in efficient operating condition, then they are repairs and are deductible.

*Estate of Walling v. Commissioner*, 373 F.2d 190, 192–93 (3d Cir.1967). According to the Commissioner's 1976 repair regulation, "[t]he cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense." 26 C.F.R. § 1.162–4 (1976). However, amounts expended in restoring property must be capitalized if they add to the value of the property, substantially prolong its life, or adapt the property to a new or different use. 26 C.F.R. § 1.263(a)–1(a), (b) (1976).

In this case, the Commissioner concedes that the items expensed by the taxpayers "were of the *type* ... that normally qualify as repair expense items." However, a number of cases have recognized that, for tax purposes, the characterization of an expenditure as a deductible repair or as a capital improvement depends on the con-

| Electric "Hyatt House" sign | $ 58,278 |
| Carpeting | 251,692 |
| Drapes | 178,288 |
| Hotel furnishings | 696,510 |
| Dining and kitchen furnishings | 297,562 |
| Office equipment | 4,585 |
| Total capital expenditures | $1,486,915 |

3. Almo/Ariz actually leased the improvements to a new entity, Alar Corporation, which was Airportel's successor-in-interest and was owned by Almo and Ariz.

4. The Commissioner did not audit the 1975 return filed by Almo/Ariz and does not challenge the $132,140 in repairs claimed by Almo/Ariz and the taxpayers in 1975.

5. References herein to Title 26 are to the Internal Revenue Code of 1954, as amended and in effect in 1976, the tax year in issue.

text in which the expenditure is made. *See, e.g., Stoeltzing v. Commissioner,* 266 F.2d 374, 377 (3d Cir.1959); *Jones v. Commissioner,* 242 F.2d 616, 619 (5th Cir.1957); *Cox v. Commissioner,* 17 T.C. 1287, 1293 (1952); *Cowell v. Commissioner,* 18 B.T.A. 997, 1002 (1930). For example:

> To fix a door or patch plaster might very well be treated as an expense when it is an incidental minor item arising in the use of the property in carrying on business, and yet ... be properly capitalized when involved in a greater plan of rehabilitation, enlargement and improvement of the entire property.

*Cowell,* 18 B.T.A. at 1002. These cases also analogize to the treatment of repair-like expenditures incurred in the construction of a new asset. As observed in *Stoeltzing,* 266 F.2d at 377:

> If [the taxpayer] had erected a completely new building, items of work which the contractor might have undertaken to prepare the building for occupancy such as carting away refuse or painting or even washing windows, could hardly be separated from the whole cost and deducted as expenses.[6]

In light of the contextual nature of the inquiry, "the courts have superimposed upon the criteria in the [Commissioner's] repair regulation an overriding precept that an expenditure made for an item which is part of a 'general plan' of rehabilitation, modernization, and improvement of the property, must be capitalized, even though, standing alone, the item may appropriately be classified as one of repair." *United States v. Wehrli,* 400 F.2d 686, 689 (10th Cir.1968). Whether such a plan exists depends upon "a realistic appraisal of all the surrounding facts and circumstances, including, but not limited to, the purpose, nature, extent, and value of the work done, e.g., whether the work was done to suit the needs of an incoming tenant, or to adapt the property to a different use, or ...

whether what was done resulted in any appreciable enhancement of the property's value." *Id.* at 690. Pursuant to this plan of rehabilitation doctrine ("rehabilitation doctrine"), the taxpayer in *Mountain Fuel Supply Co. v. United States,* 449 F.2d 816 (10th Cir.1971), *cert. denied,* 405 U.S. 989, 92 S.Ct. 1251, 31 L.Ed.2d 455 (1972), was required to capitalize the entire cost of unearthing, cleaning, transporting, reconditioning, testing, and reburying forty miles of underground pipe that, after thirty years of use, had developed a bad history of leaks. And in *Stoeltzing,* 266 F.2d at 375–76, the doctrine was applied to a taxpayer who had made substantial capital improvements and repairs to a building "in a bad state of repair" and had attempted to deduct an amount that "exceeded by almost 200% the ascribed cost of the building."

In this case, the tax court considered the factors enumerated in *Wehrli* and concluded that "a general plan of capital improvements was in effect during the taxable year in issue, specifically, for the renovation, remodeling and improvement of the hotel." *Moss,* 51 T.C.M. (CCH) at 747. It found that "although the hotel remained in very good operating condition its 'tired' interior condition was plainly visible," and "from both a functional and aesthetic standpoint, the hotel's furnishings, fixtures and design were somewhat obsolete and required remodeling." *Id.* at 744. The management agreement between Airportel and Hyatt clearly provided "for a single and complete program of improvements," and "[t]he particular items deducted as repair expenses ... were pursuant to this general scheme of improvements." *Id.* at 747. Although the tax court found that the "improvements were not made to the hotel's structure" and only had a useful life "anticipated to be approximately 3 to 5 years," *id.,*[7] it concluded that the improve-

---

6. *See also Bank of Houston v. Commissioner,* 19 T.C.M. (CCH) 589, 592 (1960) ("The construction of a *new* building encompasses numerous steps, many of which, when viewed alone, might, in the everyday, commonly accepted sense, be con-

sidered repair items. But, taken as a whole, the cost of the construction is capitalized.")

7. Although the taxpayers depreciated the plan's capital replacements over seven years, there was uncontroverted testimony that the Hotel had an

ments "added to the life of the hotel property," *id.* at 748. The tax court observed that "[e]ven though the hotel [had] always enjoyed high ratings," its increased value was evidenced by its "newly acquired four-star rating in 1978." *Id.* at 747. Based on these facts, the tax court concluded that "[t]he plan of improvements doctrine requires that the entire cost of all the expenses must be capitalized." *Id.*[8]

The taxpayers concede that they had a written plan of capital improvements for the Hotel, but contend that the rehabilitation doctrine must certainly require more than the mere existence of some formal plan combining capital improvements and repairs. They correctly point out that what the tax court described as "the hotel property" is comprised of different capital assets with different useful lives. The taxpayers argue that the rehabilitation doctrine should only be triggered by a plan that calls for substantial capital improvements and repairs to the *same* particular asset, i.e., the structure of a building. In this case, the taxpayers made no capital improvements to the Hotel structure. Their plan consisted only of replacing capital assets such as drapes, carpeting, and furniture—assets that are distinct from the Hotel structure and that have much shorter useful lives. The taxpayers find it anomalous that they should be required to depreciate normally deductible repair expenses over the thirty-year life of the Hotel structure merely because the expenses were incurred in conjunction with the replacement of other capital assets having three-to-five-year useful lives.

The taxpayers further argue that, even if the rehabilitation doctrine can be triggered by capital improvements and repairs to different assets, their plan was not one of total rehabilitation as contemplated by the cases applying the doctrine. They contend that the capital replacements and repairs made to the Hotel in 1976 were consistent with the type of capital replacements that any first-class hotel must make on an ongoing basis to remain competitive and in efficient operating condition. According to the taxpayers, the judicial decisions employing the court-created rehabilitation doctrine do not support its application to the facts presented in this case.

## ISSUE PRESENTED

Whether the rehabilitation doctrine requires the taxpayers to capitalize certain normally deductible repair expenses and to depreciate them over the remaining thirty-year life of the Hotel structure because the repairs were made as part of a plan to remodel the Hotel with furniture and furnishings having an anticipated three-to-five-year useful life.

## STANDARD OF REVIEW

Decisions of the United States Tax Court are reviewable on the same basis as decisions in civil bench trials in the United States District Courts. 26 U.S.C. § 7482(a)(1982); *Mayors v. Commissioner,* 785 F.2d 757, 759 (9th Cir.1986). Thus, we review the tax court's findings of fact, including factual inferences drawn from a stipulated record, only for clear error. *Vukasovich, Inc. v. Commissioner,* 790 F.2d 1409, 1411 (9th Cir.1986). The tax court's decisions on questions of law are reviewable de novo. *Id.* at 1411–13 (discussing at length apparent conflicts in the decisions of this circuit); *Clougherty Packing Co. v. Commissioner,* 811 F.2d 1297, 1299 (9th Cir.1987). "Mixed questions of law and fact that require the consideration of legal concepts and involve the exercise of judgment about the values underlying legal principles are reviewable *de novo.*" *Mayors,* 785 F.2d at 759.

Below, the tax court relied on *Wehrli* to conclude that "[t]he determination of whether expenses are to be capitalized pursuant to a plan of capital improvements is a

ongoing plan of completely remodeling its rooms every three to five years.

**8.** The tax court did not specifically identify the particular asset account to which the $270,268 was to be capitalized. However, it seems apparent that the tax court intended to affirm the Commissioner's determination that the expenditures were to be capitalized to the Hotel's structure and depreciated over the structure's remaining thirty-year useful life.

question of fact." *Moss*, 51 T.C.M. (CCH) at 746. In *Wehrli*, however, the Tenth Circuit merely concluded that "[w]hether the plan exists, and whether a particular item is part of it, are *usually* questions of fact." *Wehrli*, 400 F.2d at 690 (emphasis added). In this case, there is no dispute about the foregoing questions. The taxpayers concede they had a plan of capital improvements for the Hotel and concede that the expenditures at issue were part of that plan. They contend, however, that the rehabilitation doctrine is inapplicable because their plan did not rehabilitate the Hotel structure and was not of the nature or magnitude necessary to trigger the doctrine.

While we review the tax court's findings of "'basic, primary, or historical facts'" only for clear error, *United States v. McConney*, 728 F.2d 1195, 1200 (9th Cir.) (quoting *Townsend v. Sain*, 372 U.S. 293, 309 n. 6, 83 S.Ct. 745, 755 n. 6, 9 L.Ed.2d 770 (1963)), *cert. denied*, 469 U.S. 824, 105 S.Ct. 101, 83 L.Ed.2d 46 (1984), those facts are not in dispute in this case. Rather, the taxpayers contend that the tax court misinterpreted the rehabilitation doctrine in applying it to the facts as stipulated to by the parties and as found by the tax court.

We find that the taxpayers' assignments of error present questions of law, or at least mixed questions of law and fact subject to de novo review.[9] As acknowledged in *Wehrli*, the rehabilitation doctrine is "an overriding precept" that the courts "have superimposed upon the criteria in the [Commissioner's] repair regulation." *Wehrli*, 400 F.2d at 689. By their first argument on appeal, the taxpayers seek a bright-line rule that the rehabilitation doctrine is inapplicable unless a taxpayer's plan calls for substantial capital improvements and re-

pairs to the same particular asset (*e.g.*, the Hotel structure.)[10] The argument presents a question of law, "decision of which is unembarrassed by any disputed question of fact or any necessity to draw an inference of fact from the basic findings." *Trust of Bingham v. Commissioner*, 325 U.S. 365, 371, 65 S.Ct. 1232, 1235, 89 L.Ed. 1670 (1945) (holding that whether, on the facts as found by the tax court, certain legal expenses were nondeductible, was a question of law turning on the meaning of the relevant statutory language). The taxpayer's second contention, that their plan was not of the nature or magnitude necessary to trigger the doctrine, is at least a mixed question of law and fact requiring us to determine whether the tax court properly interpreted the purpose and scope of a court-created tax rule, as articulated in the case law, and whether the tax court correctly applied that rule to the undisputed facts of this case. *See McConney*, 728 F.2d at 1202 (review of mixed questions is de novo when the inquiry "requires us to consider legal concepts in the mix of fact and law and to exercise judgment about the values that animate legal principles"); *see also Lundgren v. Freeman*, 307 F.2d 104, 115 (9th Cir.1962) (distinguishing between "inferences derived from application of a legal standard" and inferences derived from the trial judge's "'experience with the mainsprings of human conduct'") (quoting *Commissioner v. Duberstein*, 363 U.S. 278, 289, 80 S.Ct. 1190, 1198, 4 L.Ed.2d 1218 (1960)).

The issues presented by this case are analogous to the issue presented in *Helvering v. Tex-Penn Oil Co.*, 300 U.S. 481, 57 S.Ct. 569, 81 L.Ed. 755 (1937), the Supreme Court tax case discussed in *McConney* to illustrate when de novo review of mixed

9. Mixed questions are those in which "the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard." *Pullman-Standard v. Swint*, 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1790 n. 19, 72 L.Ed.2d 66 (1982).

10. Arguably, one might characterize the taxpayers' appeal as a challenge to the tax court's *factual* determination that the taxpayers' plan rehabilitated the Hotel structure. The tax court,

however, made no such factual finding. Rather, it determined that the taxpayers' plan added to the value and life of "the hotel property" as a whole. *Moss*, 51 T.C.M. (CCH) at 747–48. The tax court's holding was based on its legal conclusion that, in applying the rehabilitation doctrine, the entire Hotel property (i.e., the buildings, furnishings, fixtures, machinery, and equipment) should be viewed as a single, indivisible asset.

questions is appropriate. At issue in *Tex-Penn Oil* was whether a corporate sale of assets fell within the non-recognition of gain provisions of § 202(b) of the Revenue Act of 1918. The Supreme Court accepted the Board of Tax Appeals' extensive factual findings respecting the complex structure and terms of the sale because they were supported by substantial evidence, but concluded that the Board's " 'ultimate finding' " that the transaction did not fall within § 202(b) was "a conclusion of law or at least a determination of a mixed question of law and fact" subject to the Court's independent review. *Tex-Penn Oil*, 300 U.S. at 491, 57 S.Ct. at 574. Similarly, while we accept the tax court's basic findings of fact respecting the taxpayers' plan unless those findings are clearly erroneous, we subject to our independent review the tax court's ultimate conclusion that the taxpayers' plan falls within the scope of the rehabilitation doctrine.[11]

## DISCUSSION

■ The taxpayers contend that since they made no capital improvements to the Hotel structure itself, the tax court erred in concluding that a plan of rehabilitation existed for that particular capital asset. They rely on cases that explain the conceptual basis for the rehabilitation doctrine by analogizing to the treatment of repair-like expenditures incurred in the construction of a new asset. *See, e.g., Stoeltzing*, 266 F.2d at 377; *Bank of Houston*, 19 T.C.M.

(CCH) at 592. When both substantial capital improvements and repairs are made to a particular asset at the same time, the distinction between the capital improvements and repairs disappears because all the expenditures combine to change the asset's use, increase its value, or prolong its life. According to the taxpayers, the rehabilitation doctrine is simply a judicial acknowledgement of the foregoing fact. Since the taxpayers' plan consisted only of replacing certain assets—i.e., carpeting, drapes, and furniture—and of repainting and repapering a different asset—i.e., the Hotel structure—the taxpayers contend that there is no difficulty in distinguishing the impact of the capital replacements from the impact of the repairs on the Hotel property. The capital replacements were properly capitalized and depreciated over a useful life that is many times shorter than the remaining useful life of the Hotel structure. The repainting and repapering expenditures did not substantially prolong the life or appreciably add to the value of the Hotel structure. Thus, the taxpayers submit, the conceptual foundation for applying the rehabilitation doctrine is simply not present in this case.

The taxpayers' theory is certainly consistent with the case law. To our knowledge, every case in which the rehabilitation doctrine has been applied to date has involved substantial capital improvements and repairs to the same specific asset, usually a structure in a state of disrepair.[12]

**11.** *See also Katherine Lynn McCarthy Trust v. Commissioner*, 817 F.2d 558, 559 (9th Cir.1987) (holding that, when the parties do not dispute the substance of the transaction, "[a]pplication of the Internal Revenue Code ... is a question of law subject to de novo review"); *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1047 n. 3 (9th Cir.1976) (contrasting cases that "deal with purely factual questions to which the legal conclusion is clear" with the case in which "the factual issues [are] generally undisputed with only the legal implications uncertain"); *Lundgren v. Commissioner*, 376 F.2d 623, 627 (9th Cir.1967) (when the determination whether a particular loss or expense was incurred in the taxpayer's trade or business involves the interpretation of a statute, "the question is a mixed one of law and fact and is subject to review by this court"); *Commissioner v. Boeing*, 106 F.2d 305, 309 (9th Cir.) (Board of Tax Appeals' find-

ings that the taxpayer's gains and losses resulted from sales of capital assets rather than stock in trade were "conclusions of law, or mixed questions of law and fact ... subject to independent judicial review"), *cert. denied*, 308 U.S. 619, 60 S.Ct. 295, 84 L.Ed. 517 (1939).

**12.** *See, e.g., Wehrli*, 400 F.2d at 688 (building air-conditioned; interior space rearranged by tearing out hallway, load-bearing wall, and vaults; new wall partitions and floor covering installed; restrooms relocated; new electrical wiring and plumbing fixtures installed); *Jones*, 242 F.2d at 617, 620 (taxpayer completely renovated a structure that had been declared "unfit for habitation" and characterized his work as " 'more like the reconstruction of a building gutted by fire than ordinary repairs to old apartments' "); *Hubble v. Kavanagh*, 54–1 U.S.Tax Cas. (CCH) ¶ 9364 at 45,826 (E.D.Mich.1954)

Here, however, the Commissioner and the tax court have required the taxpayers to capitalize normally deductible repair expenses to the account of a particular capital asset that was otherwise untouched by the taxpayers' plan. The tax court's application of the doctrine in this case—to a building in very good operating condition and to a remodeling plan involving no structural renovation—marks a broad extension of doctrine's historical scope. Moreover, the incongruous tax consequences of applying the doctrine to the taxpayers' plan would appear to counsel against such an extension.

At the very least, the fact that the taxpayer's plan involved no structural improvements to the Hotel is a significant factor weighing against the application of the rehabilitation doctrine in this case. However, rather than adopting the bright-line rule advanced by the taxpayers, we hold for the taxpayers on narrower grounds. The reasoning of two tax court

(taxpayer required by building, safety, health, and fire regulations to structurally rehabilitate rooming houses that were "bug-ridden, rat-infested, badly in need of repairs, unsafe for dwelling purposes, and hardly fit for human habitation"), aff'd per curiam, 220 F.2d 753 (6th Cir.1955); California Casket Co. v. Commissioner, 19 T.C. 32, 37 (1952) (taxpayer restored entire foundation system of a building that "was unsuited for safe use and occupancy by any business"); Cox, 17 T.C. at 1293 (taxpayer renovated building that "had been vacant for two years or more and had fallen into a state of disrepair"); Home News Publishing Co. v. Commissioner, 18 B.T.A. 1008, 1009 (1930) (building inspector considered building "unsafe" for occupancy, and taxpayer replaced inadequate wooden girders, installed new glass front to first floor of the building, inserted a window in one of the walls, put down new floors, and repaired the walls, partitions, and ceilings); Cowell, 18 B.T.A. at 1000 (electrical wiring and plumbing replaced, new heating system installed, entire building jacked up and superstructure reinforced with steel supports, roof repaired, and interior reconstructed); Barron v. Commissioner, 22 T.C.M. (CCH) 1655, 1658 (1963) (at time of trial, taxpayers expenditures to recondition unrentable apartment building exceeded two-thirds of the purchase price, and the work was only one-third completed); Bank of Houston, 19 T.C.M. (CCH) at 590 (sections of floor replaced, wiring repaired and replaced, waste and water plumbing repaired, steam lines relocated, window frames repaired and windows replaced, and interior wall removed).

decisions, both of which were appealed to this court, support the taxpayers' second contention that their plan was simply not of the nature or scope necessary to trigger the rehabilitation doctrine. In *Kaonis v. Commissioner*, 37 T.C.M. (CCH) 792 (1978), aff'd mem., 639 F.2d 788 (9th Cir. 1981), the taxpayer had deducted all costs incurred in renovating a rental house. The tax court found that "these expenditures were in large part capital in nature" and "clearly added to the value of the property and were not made to restore it to its previous condition." *Id.* at 796. However, the tax court allowed the taxpayer to deduct expenditures for repairs such as painting and cleaning. It found the rehabilitation doctrine inapplicable because "the property was tenantable and generally suitable for its use in the trade or business," and "[t]he repairs and additions here were not part of a plan of total rehabilitation such as those contemplated in [cases applying the doctrine.]" *Id.*[13]

**13.** Below, the tax court attempted to distinguish *Kaonis* from this case. It observed that the tax court in *Kaonis* "held that the repairs performed by the taxpayer merely restored the property to its prior condition but did not add to its value nor prolong its life." *Moss,* 51 T.C.M. (CCH) at 748. However, the tax court's analysis of *Kaonis* was flawed. In applying the rehabilitation doctrine, the proper focus is on the impact of the entire plan of capital improvements, and not simply on the impact of the repairs. By definition, repairs do not add to the value of property or prolong its life. As we previously noted, the *Kaonis* court expressly found that the capital improvements undertaken by the taxpayer "clearly added to the value of the property and were not made to restore it to its previous condition," but concluded that the repairs and capital improvements were not so extensive as to trigger the rehabilitation doctrine. *Kaonis,* 37 T.C.M. (CCH) at 796.

We also find significant the Commissioner's concession at oral argument that, had the taxpayers made the same type of capital improvements to a rental house rather than to a large hotel, they would have been entitled to treat their painting and wallpapering expenses as deductible repairs. The Commissioner attempted to distinguish *Kaonis* from this case by pointing to the "magnitude" of the taxpayers' plan. However, no authority has been called to our attention to support the proposition that the tax consequences of qualitatively identical remodeling plans should vary depending upon the size of the taxpayer's building.

In *Keller Street Dev. Co. v. Commissioner*, 37 T.C. 559 (1961), *aff'd in part and rev'd in part on other grounds*, 323 F.2d 166 (9th Cir.1963), the taxpayer, a brewery, had made some capital improvements in plant and equipment, most of which were designed to increase productive capacity so it could fill increasing demand. The Commissioner argued that certain expenses deducted by the taxpayer should have been capitalized because they were "part of a general betterment program." *Id.* at 567. However, the court declined to apply the rehabilitation doctrine because "the brewery was in operating condition and use during the taxable years in question and had been for several years before." *Id.* at 568. It also found that the "capital improvements made to increase capacity [were] not such as would constitute a general betterment program," and that the few other capital improvements made by the taxpayer "were of the type that must be constantly made by a manufacturer in a competitive industry and therefore [are] not to be considered part of a betterment program." *Id.*

Clearly, *Kaonis* and *Keller* were stronger candidates for application of the rehabilitation doctrine than this case, for they involved substantial capital improvements and repairs to the same structure. In this case, as was true in *Kaonis* and *Keller*, the taxpayers' property was generally suitable for its intended use. Indeed, the tax court specifically found that the Hotel had always enjoyed high ratings, was in very good operating condition, and remained in operation throughout the period of remodeling. The foregoing facts are certainly not dispositive of whether the rehabilitation doctrine should be applied in a particular case. However, they support our conclusion that the taxpayers' plan in 1976 was consistent with the type of annual maintenance activities necessary to maintain the Hotel in first-class condition, and that the tax court erred in applying the rehabilitation doctrine to the facts of this case.

While the tax court expressly rejected the taxpayers' contention that their plan was consistent with the Hotel's ongoing maintenance needs, its conclusion was based on faulty reasoning rather than on any factual findings. The taxpayers introduced evidence of their annual expenditures on repairs and capital improvements from 1977 to 1984 to demonstrate that the expenditures in 1976 were consistent with the Hotel's ongoing program of maintenance and capital replacements. The tax court, however, dismissed the evidence as only establishing that the 1976 expenditures were "more consistent with Hyatt's management style and recommendations, rather than any such ongoing program of [the taxpayers]." *Moss*, 51 T.C.M. (CCH) at 748. The tax court apparently failed to realize that, prior to November 1975, the taxpayers never had their own ongoing program of hotel maintenance. They had always leased the Hotel land and structures under a triple-net lease to Airportel, then an IAHS subsidiary. The taxpayers' program has always been based on Hyatt's management style and recommendations. Thus, the taxpayers' annual expenditures from 1977 and 1984 are clearly persuasive evidence, and perhaps the best evidence, of the scope of annual maintenance and capital replacement necessary to maintain the Hotel as a competitive, first-class establishment.

Nor is our holding inconsistent with any of the tax court's findings of the basic, primary, or historical facts underlying this case. Given the tax court's express finding that the plan's capital replacements had useful lives of three to five years, we would expect the taxpayers or Hyatt to remodel from 120 to 200 rooms on an annual basis just to maintain the Hotel in good operating condition. Thus, in 1976, the taxpayers essentially accomplished two solid years of remodeling in one year. Moreover, the tax court found that the taxpayers actually commenced their plan in November 1975. Had the taxpayers started remodeling the Hotel's interior a few months earlier, completing 200 guest rooms in 1975 and 200 guest rooms in 1976, the plan would have fallen squarely within the normal range of ongoing Hotel maintenance activities. As observed by one of the Commissioner's witnesses, and as found by

the tax court, the expenditures in 1976 were " 'on the high side' " for a given year. *Id.* at 747. We do not think, however, that the rehabilitation doctrine is so rigid that the tax consequences to the taxpayers should be drastically altered by minor variations in the Hotel's pattern of annual capital replacements and repairs. Given that the Hotel must completely remodel its interior every three to five years in order to remain competitive, there may be sound business reasons why the taxpayers or management may wish to accomplish the bulk of capital replacement in a particular year rather than spreading it out evenly over each year in the cycle.[14]

The tax court concluded that the Hotel's increased value was evidenced by its "newly acquired [AAA] four-star rating in 1978." *Id.* at 747. However, the taxpayer's plan was completed in 1975 and 1976, and the Hotel had consistently enjoyed an "excellent" rating—the pre–1977 equivalent to four stars—up until the very year that the remodeling program was commenced. Thus, the taxpayers' plan of improvements really only served to maintain the four-star status of the Hotel. Even if there was a brief decline in the Hotel's AAA rating prior to November 1975, that does not alter the fact that the scope of the taxpayers' plan was generally consistent with the Hotel's ongoing maintenance needs.

■ In its opinion, the tax court emphasized that the taxpayers' expenditures were pursuant to a written plan and that the improvements were of great importance to both the taxpayers and Hyatt. The tax court stressed that the Hyatt/Airportel

management agreement "required the completion of 'substantial repairs and improvements' ... [including] improvements, additions and alterations to the hotel." *Moss,* 51 T.C.M. (CCH) at 747. However, it is well-settled that tax consequences are determined by "what in fact was done rather than by the mere form of words used in the writings employed." *Tex-Penn Oil,* 300 U.S. at 493, 57 S.Ct. at 574. The mere existence of a written plan is not sufficient to trigger the rehabilitation doctrine. Any commercial enterprise, such as the Hotel in this case, that annually spends large sums of money on capital replacements and repairs certainly must do so pursuant to a detailed plan and budget.

## CONCLUSION

In applying the rehabilitation doctrine, the court must evaluate the taxpayers' expenditures in the context of the taxpayer's particular business enterprise. We conclude that the taxpayers' remodeling plan in 1976 was consistent with the type of capital replacement and repair expenditures that the Hotel must continuously make in order to remain competitive and in first-class condition. This case is clearly distinguishable from those cases in which the rehabilitation doctrine has been invoked, and it would be anomalous to require the taxpayers to depreciate normally deductible repairs over thirty years merely because the repairs were made in conjunction with the installation of furnishings having a three-to-five-year useful life. Accordingly, we hold that the rehabilitation doctrine is inapplicable to the facts of this

---

**14.** By accomplishing the bulk of a particular cycle's capital replacements in one particular year, the Hotel might reduce its material and labor costs, minimize the disruptions to its operations, or better preserve stylistic consistency throughout the Hotel.

For example, as part of its findings, the tax court adopted testimony that, when Hyatt took over the Hotel in 1975, its interior was " 'tired.' " *Moss,* 51 T.C.M. (CCH) at 744. According to Mr. Sam Cala, Hyatt's Director of Engineering at the Hotel, the Hotel was "tired" because

the carpets ... were a little brighter than I would have liked, ... the design wasn't exactly [to] my liking, ... the chandeliers weren't all that pretty, but they were there;

they were working. The restaurants were dark red [in color].... [I]n my opinion, I felt that it could ... have been remodeled....

Thus, it is apparent from the testimony that the expanded scope of capital replacements in 1976 was in large part designed to give the Hotel a "look" that was in keeping with Hyatt's stylistic preferences. Requiring the Hotel to spread its capital replacements evenly over its three-to-five year cycle, on pain of suffering severe adverse tax consequences, would unnecessarily handicap the Hotel in its efforts to maintain fashionable and stylistically consistent decor throughout its interior.

case, and that the taxpayers properly deducted the $260,278 in repairs as ordinary and necessary business expenses. The tax court's decision is reversed.

REVERSED.