**In re COUNTY OF ORANGE, a Political Subdivision of the State of California; Orange County Investment Pools, an Instrumentality of the County of Orange, Debtors.**

**The FEDERAL NATIONAL MORTGAGE ASSOCIATION, Movant,**

**v.**

**COUNTY OF ORANGE, a political subdivision of the State of California; Orange County Investment Pools, an instrumentality of the County of Orange, Respondents.**

**Bankruptcy Nos. SA 94–22272 JR, SA 94–22273 JR.**

United States Bankruptcy Court, C.D. California.

May 26, 1995.

---

Isaac Pachulski, Stutman, Treister & Glatt, Los Angeles, CA, Sp. Reorganization Counsel, for debtors.

Patrick C. Shea, Pillsbury, Madison & Sutro, San Diego, CA, for Official Committee of Pool Participants.

Daniel H. Slate, Adams, Duque & Hazeltine, Los Angeles, CA, for Federal Nat. Mortg. Ass'n.

Mary L. Young, Murphy Weir & Butler, Los Angeles, CA, for Orange County Creditors Committee.

Alan H. Martin, Sheppard, Mullin, Richter & Hampton, Newport Beach, CA, for School Districts.

Katherine Butts Warwick, Pettit & Martin, Los Angeles, CA, for Newport Mesa Unified School Dist.

Paul R. Glassman, Los Angeles, CA, for Orange County Cities.

Marc J. Winthrop, Winthrop Couchot, Newport Beach, CA, for Irvine Unified School Dist.

## MEMORANDUM OPINION

JOHN E. RYAN, Bankruptcy Judge.

Under California state law, certain governmental entities may deposit, or are required to deposit, excess funds into the county treasury. The county treasurer, in turn, is authorized to invest the funds in a variety of securities. Acting pursuant to this statutory authority, the Orange County Treasurer, Robert L. Citron (the "Treasurer"), commingled the funds he received and deposited them into the Orange County Investment Pool (the "OCIP"). By December 1994, 190 municipal entities had approximately $7.6 billion invested in the OCIP.

In June and July 1994, the County of Orange (the "County") and four school districts issued taxable notes amounting to $800 million, of which the Federal National Mortgage Association ("FNMA") purchased $118.5 million.

The Treasurer's investment strategy for the OCIP was based on his bet that interest rates would not rise in 1994. Accordingly, the Treasurer purchased a large amount of interest-rate sensitive securities, including $1.4 billion in FNMA Structured Notes (the "FNMA Notes"). The Treasurer's strategy ultimately proved disastrous for the County and the OCIP participants, and on December 6, 1994, the County and the OCIP filed separate chapter 9 petitions in bankruptcy.

On March 24, 1995, FNMA moved for relief from the automatic stay (the "Motion"). FNMA argues that relief is necessary to allow it to assert a right of setoff against the County and the school districts. All parties agreed to have all issues relating to the setoff

funds determined in this contested proceeding, including any right of turnover.

At the hearing on May 1, 1995, I took the matter under submission to determine whether FNMA has a right of setoff.

## JURISDICTION

This court has jurisdiction over this proceeding pursuant to 28 U.S.C. § 1334(a) (1995) (the district courts shall have original and exclusive jurisdiction of all cases under Title 11), 28 U.S.C. § 157(a) (1995) (authorizing the district courts to refer all Title 11 cases and proceedings to the bankruptcy judges for the district) and General Order No. 266, dated October 9, 1984 (referring all Title 11 cases and proceedings to the bankruptcy judges for the Central District of California). This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(G) (1995).

## STATEMENT OF FACTS

California law requires that all excess funds of certain entities be deposited with the county treasurer. *See, e.g.,* Cal.Educ. Code § 41001. Other public entities, such as cities and special districts, may deposit their excess funds into the county treasury if the deposit is authorized by their governing boards. These deposits are accepted by the treasurer for investment.[1] The treasurer may invest[2] in a variety of securities, including U.S. Treasury Notes, bonds and reverse repurchase agreements ("reverse repos"). Cal.Gov't Code §§ 53601 and 53635.

On February 2, 1988, the County Board of Supervisors (the "Board") adopted Resolution No. 88–134 which, in accordance with

---

1. Cal.Gov't Code § 53684(a) provides:

   Unless otherwise provided by law, if the treasurer of any local agency, or other official responsible for the funds of the local agency, determines that the local agency has excess funds which are not required for immediate use, the treasurer or other official may, upon the adoption of a resolution by the legislative or governing body of the local agency authorizing the investment of funds pursuant to this section and with the consent of the county treasurer, deposit the excess funds in the county treasury for the purpose of investment by the county treasurer pursuant to Section 53601 or 53635.

2. The Treasurer's authority to invest on behalf of the County is derived from Cal.Gov't Code § 53607, which states:

   The authority of the legislative body to invest or to reinvest funds of a local agency, or to sell or exchange securities so purchased, may be delegated by the legislative body to the treasurer of the local agency, who shall thereafter assume full responsibility for such transactions until such time as the delegation of authority is revoked, and shall make a monthly report of such transactions to the legislative body.

   On August 20, 1985, the County delegated its investment authority to the Treasurer pursuant to Resolution No. 85–1221.

Gov't Code § 53684, authorized local agencies to deposit their excess funds in the County treasury. The Treasurer set up the OCIP and commingled the funds deposited with him into various accounts in the OCIP.[3]

In June 1994, Newport–Mesa Unified School District, Irvine Unified School District, Orange County Board of Education and North Orange County Community College District (collectively, the "School Districts") wished to raise money by issuing notes.[4] The School Districts did not, however, have authority to issue debt directly, thereby requiring the County to issue $200 million in taxable notes (the "School Notes") in the name of the School Districts.[5] FNMA purchased $28.5 million of the School Notes.[6] The School Notes are obligations of each issuer and not the County.[7] Repayment

funds were deposited with the OCIP to pay the School Notes.

In July 1994, the County issued $600 million of County of Orange Taxable Notes (the "County Notes"), of which FNMA purchased $90 million. As with the School Notes, a repayment fund was set up with the OCIP.[8] The County pledged that if the assets in the repayment fund were insufficient to repay the County Notes in full, the deficiency would be satisfied by the County and not the OCIP.

The Treasurer's investment strategy for the OCIP involved leveraging or borrowing billions of dollars against the OCIP to obtain cash for investments,[9] thereby dramatically increasing the OCIP's risk to interest rate changes. California Bureau of State Audits, *supra*, at 13. For example, as of November

3. The OCIP consists of three different pools—a commingled investment pool, a commingled bond investment pool, and a specific investment account. California Bureau of State Audits, *Report on Orange County Treasurer's Investment Strategy*, at 2 (March 1995). The OCIP cites no California statute that authorizes the Treasurer to commingle funds of its participants. The evidence indicates, however, that the OCIP participants knew of this practice.

4. Pursuant to Cal.Gov't Code §§ 53850–53852, any local agency, including school districts, may borrow money by issuing notes.

5. Cal.Gov't Code § 53853(a) provides:

The note or notes shall be issued pursuant to a resolution authorizing the issuance thereof adopted by the legislative body of the local agency, except that the note or notes of a county board of education, school district, or community college district ... shall be issued in the name of the school district or community college district by the board of supervisors of the county ... as soon as possible following receipt of a resolution of the governing board of the school district or community college district requesting the borrowing and the note or notes of a county board of education shall be issued in the name of the county board of education by the board of supervisors of the county as soon as possible following receipt of a resolution of the county board of education requesting that the county assist in that borrowing....

6. The School Notes were issued as follows: County Board of Education—$42.2 million (FNMA purchased $6.3 million); Newport Mesa Unified School District—$47.0 million (FNMA purchased $7.0 million); North Orange County Community College—$56.3 million (FNMA pur-

chased $7.0 million); Irvine Unified School District—$54.6 million (FNMA purchased $8.2 million).

7. The official statement for the School Notes states that the Notes are payable from taxes, revenue and other moneys of the School Districts, received during or attributable to Fiscal Year 1993–94, and legally available for payment thereof.

8. The proceeds from the School Notes and the County Notes were commingled in two repayment funds, the County of Orange Taxable Note Repayment Fund and the Orange County Taxable Note Repayment Fund (Funds 274 and 274s respectively). As of April 27, 1995, the funds had a market value of approximately $615 million, which represents a loss of approximately $195 million.

9. The OCIP was leveraged through the use of reverse repos. California Bureau of State Audits, *supra*, at 10. In a reverse repo, the County "borrows" by selling a security to an investment broker with an agreement to repurchase it a short time later. *Id.* The County then receives short-term cash from the broker and agrees to pay a stipulated interest rate for the use of that money. *Id.* The County then purchases other securities with the cash, thereby "leveraging" the original principal. *Id.* at 11. If the cost of the borrowing (i.e. the interest rate charged by the investment broker) is less than the earnings on the investment, the reverse repo transaction is profitable to the County. *Id.* This difference is known as the "spread." *Id.* at 13.

The Treasurer used reverse repos as a primary means to increase the OCIP's yield and leveraged the OCIP's assets several times over. *Id.* at 11.

30, 1994, the County's leveraging strategy magnified the impact of an interest rate change on the base portfolio 2.7 times. *Id.*

The Treasurer's strategy was also risky because he purchased long-term securities with short-term borrowings. *Id.* at 20. This strategy forced the OCIP to borrow continually at current short-term rates until the long-term security matured.[10] *Id.* at 21. Thus, as short-term rates rose, the spread decreased and eventually disappeared. *Id.* at 22.

The practice of borrowing short and buying long further exposed the OCIP to an increased risk of collateral calls. *Id.* "When a broker lends money under a reverse repo, the broker requires collateral in excess of the amount lent to protect its interests." *Id.* If the market value of the collateral declines, the broker can send a collateral call to the borrower requiring additional assets to secure the borrower's interest. *Id.* Collateral calls adversely affect a securities portfolio by draining cash, requiring the deposit of additional collateral or forcing the premature liquidation of the collateral. *Id.*

The Treasurer used the funds he procured from leveraging the portfolio to invest in a variety of securities that were interest-rate sensitive, including the $634 million in FNMA Notes. The FNMA Notes were issued under a complex "book-entry" system.[11] Under this system, the FNMA Notes were issued via the book-entry system maintained by the Federal Reserve Banks to the Bank of America, which acted as the holding institution. Bank of America then transferred beneficial interests in the FNMA notes to the OCIP, the beneficial owner.

In February 1994, interest rates began rising sharply, and the value of the OCIP portfolio dropped.[12] By the end of November, the market value of the OCIP portfolio was approximately $5.8 billion. On December 6, 1994, faced with the prospect of the liquidation of the OCIP portfolio by lenders, the County and the OCIP filed chapter 9 petitions in bankruptcy.[13]

On December 16, 1994, this court authorized the orderly liquidation of the securities in the OCIP.[14] Eventually, the OCIP sold securities with a principal value of $7.8 billion for $5.8 billion, resulting in a principal loss of $2.0 billion. The FNMA Notes were sold back to FNMA for $577 million, amounting to a principal loss of $57 million. As part of the transaction, FNMA asserted a setoff of $28.5 million on the School Notes and $90 million on the County Notes. The parties

**10.** Unmatched maturity dates create risk for a securities portfolio because reverse repo borrowing rates are guaranteed only for short time periods (e.g., 180 days or less) while the rate for a typical security is much longer (e.g. two to four years). *Id.* at 22. This creates a situation where the investor must continually borrow at current short-term rates until the security matures. *Id.* If short-term interest rates rise sufficiently this will reduce, or even eliminate, the spread. *Id.*

The conservative approach to borrowing with reverse repos is to "match the maturity date of the asset purchased with the due date of the reverse repo." *Id.* at 20. This approach ensures that the cost of borrowing is fixed, thereby guaranteeing a positive spread.

**11.** This system requires two intermediaries between FNMA and the beneficial owners of the FNMA Notes. First, the Federal Reserve Banks maintain the book-entry system for the FNMA Notes. Second, certain holding institutions are eligible to maintain book-entry accounts with the Federal Reserve Banks.

**12.** On March 1, 1994, the estimated market value of the commingled investment pool and the commingled bond pool was approximately $7.1 bil-

lion. On that date, the prime rate was 6.00%. By December 6, 1994, the prime rate rose to 8.50% and the estimated market value of these pools plummeted $1.5 billion to $5.6 billion.

**13.** As the value of the OCIP dropped, lenders began making collateral calls to the OCIP. The OCIP could not meet this demand, and subsequently twelve brokerage houses, including Smith Barney, Prudential Securities, Paribas, Sanwa Bank, Cantor Fitzgerald, Dean Witter, DLJ Securities, CS First Boston, Fuji Bank, Kidder Peabody, Morgan Stanley and Nomura Securities sold their collateral.

**14.** On December 13, 1995, the OCIP brought an Ex Parte Motion for Order Authorizing Disposition of Securities. In its motion, the OCIP stated that a number of governmental economic reports and treasury note auctions were due within the next seven days. A significant risk existed that these events could force interest rates up, thereby precipitating more losses in the OCIP. Every one percent increase in rates would cause a loss of $300 million. Accordingly, the OCIP requested that it be allowed to liquidate or restructure the securities in the OCIP.

stipulated that the $118.5 million in proceeds would be held in escrow until FNMA's setoff rights were resolved.

On March 27, 1995, FNMA filed the Motion to have its rights to the escrow funds determined. FNMA contends that relief is necessary to allow it to effect its right of setoff.[15] FNMA also asserts that relief is justified because repayment of the County and School Notes is not adequately protected by the deposit of repayment funds in the OCIP with its losses or by the guarantee of the bankrupt County. The OCIP responds that the Motion must be denied because FNMA has no right of setoff under either state law or the Bankruptcy Code (the "Code").[16]

## DISCUSSION

■ Code § 553(a), which governs setoffs in bankruptcy, provides:

[T]his title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

This provision does not create an independent right of setoff. Rather, it preserves the common-law right of setoff and adds some additional requirements. *United States v. Arkison (In re Cascade Roads, Inc.)*, 34 F.3d 756, 763 (9th Cir.1994). The burden of proving an enforceable right of setoff rests with the party asserting the right. *See Pester Refining Co. v. Mapco Gas Products, Inc. (Matter of Pester Refining Co.)*, 845 F.2d 1476, 1486 (8th Cir.1988). Even if the right to setoff exists under non-bankruptcy law, because § 553 is permissive, setoff may be denied under general principles of equity. *Cascade Roads*, 34 F.3d at 763; *Federal Deposit Ins. Corp. v. Bank of America Nat'l Trust and Savings Ass'n*, 701 F.2d 831, 836–37 (9th Cir.1983), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).

■ To enforce a setoff right, FNMA must establish that (1) it has a right of setoff under nonbankruptcy law; and (2) this right should be preserved in bankruptcy under § 553.

## A. California law defines the right of setoff.

In *Harrison v. Adams*, the California Supreme Court stated that the right of setoff may only be exercised between "mutual" demands:

[I]t is well settled that a court of equity will compel a set-off when mutual demands are held under such circumstances that one of them should be applied against the other and only the balance recovered. The insolvency of the party against whom the relief is sought affords sufficient ground for invoking this equitable principle.

20 Cal.2d 646, 128 P.2d 9, 11 (1942) (citations omitted).

■ Mutuality is generally an issue of state law. 4 *Collier on Bankruptcy*, ¶ 553.04 at 553–20 n. 3. However, because California law is consistent with federal common law, federal law is directly applicable. *Murphy v. Federal Deposit Insurance Corp.*, 38 F.3d 1490, 1504 (9th Cir.1994). Moreover, "in practice courts apply federal bankruptcy precedent and rarely refer to state law to determine whether mutuality exists." 4 *Collier, supra*, ¶ 553.04 at 553–20. Further, the mutuality requirement in bankruptcy should be strictly construed because setoffs run contrary to fundamental bankruptcy policies such as the equal treatment of creditors and the preservation of a reorganizing debtor's assets:

As Congress recognized, setoffs work against both the goal of orderly reorganization and the fairness principle because they preserve serendipitous advantages accruing to creditors who happen to hold mutual obligations, thus disfavoring other equally-deserving creditors and interrupting the debtor's cash flow.

---

**15.** Pursuant to Code § 362(a)(7), the filing of a petition stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor."

**16.** The Code is set forth in 11 U.S.C. §§ 101–1330 (1995).

*Public Service Co. of New Hampshire v. New Hampshire Electric Cooperative, Inc. (In re Public Service Co. Of New Hampshire)*, 884 F.2d 11, 13 (1st Cir.1989), *citing*, H.R.Rep. No. 595 *reprinted in* 1978 U.S.Code Cong. & Admin. News 6143–45; *see State of Illinois v. Lakeside Community Hospital, Inc. (In re Lakeside Community Hospital, Inc.)*, 151 B.R. 887, 891 (N.D.Ill.1993) ("Courts strictly construe mutuality.").

■ The Ninth Circuit has set forth the standard for determining mutuality of debts: (1) the debts must be in the same right; (2) the debts must be between the same individuals; and (3) those same individuals must stand in the same capacity. *In re Visiting Home Services, Inc.*, 643 F.2d 1356, 1360 (9th Cir.1981); *accord Prudential Reinsurance Co. v. Superior Court*, 3 Cal.4th. 1118, 14 Cal.Rptr.2d 749, 753–54, 842 P.2d 48, 52–53 (1992).[17]

### 1. The debts must be in the same right.

■ A pre-petition debt does not have the same rights for purposes of setoff as a post-petition debt. *In re Bay State York Co., Inc.*, 140 B.R. 608, 614 (Bankr.D.Mass.1992); *In re NTG Industries, Inc.*, 103 B.R. 195, 196 (Bankr.N.D.Ill.1989). Here, the relevant debts arose pre-petition, thereby satisfying this requirement.

### 2. The debts must be between the same parties.

■ Addressing the County situation first, the County is indebted to FNMA on the County Notes, while FNMA is indebted to the OCIP on the FNMA Notes. FNMA asserts that the County and the OCIP should

be treated as the same party for purposes of setoff.

■ FNMA argues that the County and the OCIP are the same entity because the County exercises complete control over the OCIP (i.e., the OCIP is an "instrumentality" of the County). A "control" relationship does not, however, necessarily make two entities a single entity for setoff purposes. *Baruch Investment Co. v. Danning (Matter of Vehm Engineering Corporation)*, 521 F.2d 186, 190–91 (9th Cir.1975) ("[A]lthough AIF and TWF were controlled and dominated by the same person, the two corporations 'were at all relevant times separate legal entities.' Hence, the debts are not 'mutual' and may not be offset against each other."); *see also Inland Steel Co. v. Berger Steel Co. (In re Berger Steel Co.)*, 327 F.2d 401, 403–04 (7th Cir.1964) (debt owed to a parent company and debt owed by the parent's wholly-owned subsidiary were not mutual).

Here, the relationship between the County and the OCIP is analogous to the relationship between a parent and its wholly-owned subsidiary. Through the Treasurer, the County had oversight responsibilities for the OCIP.[18] The Treasurer set up the OCIP as a separate and distinct entity to carry out his statutory duties.[19] The OCIP served as an investment vehicle for the County and approximately 190 other participants. It purchased securities, borrowed funds from various financial institutions and transferred securities as collateral for loans. Moreover, it liquidated its assets, distributed funds and provided accountings to its participants. According to Cal.Gov't Code § 27100.1, the

---

17. In *Prudential*, the California Supreme Court held:

The key to setoff is the requirement of mutuality. Justice Benjamin Cardozo defined mutuality as follows: "To be mutual, [the debts] must be due to and from the same persons in the same capacity...."

Next, such debts must exist between the same persons.... Finally, the setoff can occur only between persons or entities of equal capacity; debts owed in a fiduciary, agency, trustee, or partnership capacity are not subject to setoff.

*Prudential*, 14 Cal.Rptr.2d at 754, 842 P.2d at 53 (citations omitted).

18. The Treasurer is an officer of the County. Cal.Gov't Code § 24000(f).

19. Under Cal.Gov't Code § 27000, excess funds of the County and other entities are to be deposited with the Treasurer for investment. The County had oversight and control responsibilities over the OCIP through its supervisory control over the Treasurer. Cal.Gov't Code § 25303 ("The board of supervisors shall supervise the official conduct of all county officers ... particularly insofar as the functions and duties of such county officers ... relate to the assessing, collecting, safekeeping, management, or disbursement of public funds....")

funds invested with the Treasurer were to be held in trust.[20] The Treasurer had a fiduciary responsibility to the OCIP participants to maintain the safety and principal value of their funds.[21]

The OCIP had a separate identity and conducted its business within the scope of its delegated authority. The facts show that the OCIP purchased the FNMA Notes for the benefit of its participants. As a participant in the OCIP, the County had a beneficial interest in the FNMA Notes. The County, however, did not own the FNMA Notes. Thus, the OCIP had rights and obligations distinctly different from those of the County.

Accordingly, based on the foregoing legal and factual distinctions, the County and the OCIP should not be treated as the same party.[22]

FNMA also contends that because the County exercised dominion over the School Districts' assets, the School Districts and the County should be treated as the same party. Thus, because the School Districts deposited the proceeds from the sale of School Notes into the OCIP, the School Districts should be lumped with the County and the OCIP in determining mutuality.

This contention is wrong because the School Districts are distinct governmental entities that are autonomous from the County. Article IX, Section 5 of the Constitution of the State of California provides that the

legislature shall establish a "system of common schools." In accordance with this provision, the California legislature has established a separately elected board of education to oversee the School Districts.[23] The legislature has set forth specific powers and duties of the school boards, including the power to sue and be sued and to hold and convey property. Cal.Educ.Code § 35162. The California Supreme Court has also recognized that, as a separate entity, the County does not control the School Districts:

> There is no doubt but that a school district is a corporate entity separate and distinct from the county. The county officers, as such, have no control over the funds of the school district. The power to make contracts payable out of the funds of the district is vested exclusively in the school board. The business of the district is managed independently of the board of supervisors [of the county] by its own executive and administrative officials. Finally, school districts may sue and be sued separately.

*Anaheim Sugar Co. v. Orange County,* 181 Cal. 212, 183 P. 809, 812 (1919); *see Gould v. Richmond School Dist.,* 58 Cal.App.2d 497, 136 P.2d 864 (1943) (a school district "is an independent and separate governmental agency from the county....").

FNMA also argues that the School Districts are subordinate to the County because

---

**20.** Cal.Gov't Code § 27100.1 states:

Notwithstanding any other provision of law, when any public entity or any public official acting in a fiduciary capacity, who is required or authorized by law to deposit funds in the county treasury, makes a deposit, those funds shall be deemed to be held in trust by the county treasurer on behalf of the depositing entity or public official. The funds shall not be deemed funds or assets of the county and the relationship of the depositing entity or public official and the county shall not be one of creditor-debtor.

**21.** Cal.Gov't Code § 27000 provides: "The County treasurer shall receive and keep safely all money belonging to the county and all other money directed by law to be paid to him...."

**22.** The County also argues that no mutuality exists between FNMA and the OCIP because FNMA's obligation runs only to the OCIP's ac-

count at Bank of America and not to the OCIP directly. In *Lucas v. Lucas,* 946 F.2d 1318, 1323 (8th Cir.1991), the court held that "[t]he fact that a holding agent such as the Depository Trust Company possesses the certificate does not diminish the fact that the shareholder owns the security." Certainly, an owner of a security has standing to sue the issuer of the security if the issuer defaults on its obligations. Accordingly, a direct relationship exists between FNMA and the OCIP, and the County's argument fails.

**23.** Section 7 provides that the legislature "shall provide for the appointment or election of the State Board of Education and a board of education in each county...." Cal.Educ.Code § 35010(a) provides that "every school district shall be under the control of a board of school trustees or a board of education...." Cal.Educ. Code § 35012 provides that "the governing board of a school district shall consist of five members elected at large by the qualified voters of the district...."

the School Districts cannot issue debt. This argument is also wrong because the School Notes were issued by the County in the name of the School Districts and are the sole obligations of the School Districts.

Based on the foregoing, it is clear that the School Districts and the County are separate parties and, thus, the County and the School Districts should not be viewed as the same party for purposes of satisfying the mutuality requirements.

FNMA further contends that because the County, the OCIP, and the School Districts are subdivisions of the State of California, they should be viewed as one and the same party. FNMA cites *Cherry Cotton Mills v. United States*, 327 U.S. 536, 66 S.Ct. 729, 90 L.Ed. 835 (1946), for this view. In *Cherry*, the federal government attempted to set off a tax refund it owed to the petitioner under the Agricultural Adjustment Act against money that the petitioner owed on a note to a federal agency, the Reconstruction Finance Corporation (the "RFC"). *Id.* at 537, 66 S.Ct. at 729. The Supreme Court held that mutuality existed between the two federal agencies, in part, because "all of [their] money comes from the Government; [their] profits if any go to the Government; [their] losses the Government must bear." *Id.* at 539, 66 S.Ct. at 730.[24]

The *Cherry* case is distinguishable from this case, however, because in *Cherry*, the debts and credits of the government and the RFC were payable to and from the same source—the United States Treasury. In contrast, the debts and credits of the County, the OCIP and the School Districts are not paid to or from the State of California. The

County is solely responsible for satisfying the County Notes, and the School Districts have individual responsibility for their obligations under the School Notes. Additionally, the OCIP has no obligation under the County or School Notes. Moreover, the proceeds from the County and School Notes went directly to each issuer with the OCIP and the State of California receiving nothing from these offerings.[25]

The only case that FNMA cites involving this issue in a state context is *In re Bennett Co., Inc.*, 118 B.R. 564 (Bankr.M.D.Tenn. 1990). In *Bennett*, the State of Tennessee's Department of General Services contracted with the debtor to perform roof repairs at a facility operated by the Tennessee Department of Mental Health and Mental Retardation (the "DMHMR"). *Id.* at 565. The debtor invoiced the DMHMR directly. *Id.* On January 8, 1990, the debtor filed chapter 7. *Id.* The state, through its Department of Employment Security (the "DES"), filed a proof of claim for unpaid employment taxes. *Id.* The state subsequently filed a motion for relief from stay to set off the amount it owed for the roof repairs against the unpaid employment taxes. *Id.* The debtor responded that the obligations were not mutual because the DES was not the DMHMR. *Id.* The court held that the obligations were mutual because the overdue taxes belonged to the state and the roofing contract was a debt of the state. *Id.* at 566.

This case is distinguishable from *Bennett* because the obligations of FNMA on the FNMA Notes do not belong to the County or the School Districts, but rather to the OCIP and its 190 beneficial participants.[26]

---

**24.** The County responds that *Cherry* was not a bankruptcy case and is not controlling in the bankruptcy context. Instead, the County argues that the logic extended in cases such as *Westamerica Bank v. United States*, 178 B.R. 493 (N.D.Cal.1995) and *Shugrue v. Fischer (In re Ionosphere Clubs, Inc.)*, 164 B.R. 839, 842–43 (Bankr.S.D.N.Y.1994) should apply.

In *Westamerica*, the Maritime Administration, Department of Transportation ("MARAD") attempted to offset its debt to a ship repair contractor ("Donco") against claims of other federal agencies against Donco. *Westamerica*, 178 B.R. at 494. The United States cited *Cherry* in support of its position. *Id.* at 496. The *Westamerica*

court held that *Cherry* was inapplicable because it did not involve a bankruptcy where the court must consider the effects of setoff on other competing creditors. *Id.* at 497–98. I support the *Westamerica* and *Shugrue* line of authority that distinguishes *Cherry* in the bankruptcy context.

**25.** The proceeds from the School Notes went to the School Districts who then invested those proceeds in the OCIP. This procedure did not, however, transform the School Districts' assets into assets of the State of California or the OCIP.

**26.** FNMA also cites *In re Mohar*, 140 B.R. 273 (Bankr.D.Mont.1992); *In re Julien Co.*, 116 B.R. 623 (Bankr.W.D.Tenn.1990); *In re Thomas*, 84

Accordingly, *Cherry* and its progeny are distinguishable from the situation here so that the County, the OCIP and the School Districts should not be viewed as one and the same party for mutuality purposes.

### 3. The parties must be standing in the same capacity.

■■■■ Mutuality requires not only that the parties be the same, but also that they act in the same capacity. *In re Warren,* 93 B.R. 710, 712 (Bankr.C.D.Cal.1988). Thus, for example, where the debt of an entity arises from a fiduciary duty, or is in the nature of a trust, there is no mutuality. *Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp., Inc.),* 473 F.2d 262 (9th Cir.1973), *cert. denied,* 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973). In *Bob Richards,* the debtor, a wholly-owned subsidiary of Western Dealer Management, Inc. ("WDM"), owed WDM $45,000. *Id.* at 263. In 1966, the debtor was owed a $10,063.25 tax refund. *Id.* This refund was delivered to WDM,[27] and WDM claimed it as an offset against debtor's $45,000 debt. *Id.* The Ninth Circuit held that the setoff was improper:

> [W]here the liability of one claiming a set-off arises from a fiduciary duty or is in the nature of a trust, the requisite mutuality of debts and credits does not exist.... The rationale of this rule is simply that the liability arising from a fiduciary duty is entirely independent of the debt owing from the bankrupt.

*Id.* at 265 (citations omitted); *See Toys "R" Us, Inc. v. Esgro, Inc. (Matter of Esgro, Inc.),* 645 F.2d 794, 797 (9th Cir.1981).

Applying *Bob Richards* here, the County incurred its debt on the County Notes in its "individual" capacity. Even if the County and the OCIP should be treated as the same entity, mutuality still does not exist because the OCIP purchased the FNMA Notes in a representative capacity on behalf of the OCIP participants. In other words, FNMA owes $90 million to the OCIP in its representative, rather than its individual, capacity.

This same reasoning applies to the School Districts. They had no individual interest in the FNMA Notes. Rather, their interests were indirect as participants in the OCIP. Accordingly, the parties do not stand in the same capacity.

In summary, FNMA has failed to establish two of the three requirements of mutuality in that the County, the OCIP, and the School Districts are not the same party and even if they were treated as the same party, the OCIP acted in a representative rather than individual capacity when it purchased the FNMA Notes.

### B. Sovereign immunity has been waived.

■■■■ The County contends that the doctrine of sovereign immunity prohibits FNMA from setting off. The Ninth Circuit has held that, in general, the State of California cannot be sued directly or indirectly by setting up a counterclaim, cross-complaint, or setoff, except when this is permitted expressly by statute. *Sunset Oil Co. v. State of California,* 87 F.2d 972, 974 (9th Cir.1937); *Harsh California Corp. v. County of San Bernardino,* 262 F.2d 626, 628 (9th Cir.1958) (this rule applies equally to political subdivisions of the state).

In *Sunset,* Sunset Pacific Oil Co. ("Sunset") and its subsidiary were engaged in the business of producing and refining oil. *Sunset,* 87 F.2d at 973. On March 31, 1931, Sunset owed $51,021.72 in quarterly taxes to the State of California. *Id.* Sunset paid $45,095.11 and attempted to offset the remaining $5,926.61 against its tax overpayment from the previous quarter. *Id.* at 973–74. The state argued that Sunset's action

B.R. 438, 440 (Bankr.N.D.Tex.), *aff'd in part and rev'd in part,* 91 B.R. 731 (N.D.Tex.1988), *amended,* 93 B.R. 475 (N.D.Tex.1988); *In re Sound Emporium, Inc.,* 48 B.R. 1 (Bankr.W.D.Tex. 1984), *aff'd,* 70 B.R. 22 (W.D.Tex.1987); and *Waldron v. Farmers Home Administration,* 75 B.R. 25, 27 (N.D.Tex.1987) in support of its argument. These cases are distinguishable from this case because they all involved different federal agencies whose debts and credits were payable to and from the same source.

27. The tax refund was not paid directly to the debtor because income tax regulations required that the parent corporation handle all of its subsidiaries' tax matters. *Id.* at 265.

was improper because the doctrine of sovereign immunity bars any setoff against the state absent consent. *Id.* at 974. The *Sunset* court addressed the issue by examining the history of sovereign immunity in California. On February 28, 1893, the California Legislature passed an act (the "1893 Act") authorizing suits against the state for claims "on contract or for negligence." *Id.* On February 26, 1929, the California Supreme Court held in *Welsbach v. State,* 206 Cal. 556, 275 P. 436 (1929), that a corporation's right to recover taxes inappropriately assessed arose from an implied contract with the state and, therefore, the action was expressly authorized under the 1893 Act. *Sunset,* 87 F.2d at 974. Two months later, the California legislature responded by repealing the 1893 Act and adding §§ 686–692 to the California Political Code (now the California Government Code). *Id.* Section 688 replaces "claims on contract or for negligence" with a claim on "*express* contract or for negligence." *Id.* at 975 (emphasis added). This change prompted the *Sunset* court to conclude that a party could not set off against the State of California on an implied contract theory. *Id.*

This case is distinguishable from *Sunset,* however, because FNMA's action is based on express contracts.[28]

■■■ Given that the doctrine of sovereign immunity does not apply to the state's liability on a contract, a defendant can file a cross-complaint against the state on the same transaction in which it is being sued. *Souza & McCue Construction Co. v. Superior Court,* 57 Cal.2d 508, 20 Cal.Rptr. 634, 635, 370 P.2d 338, 339 (1962). For example, in *Souza,* the City of Salinas brought an action against Souza & McCue Construction Co. ("Souza") for breach of contract for construction of a storm sewer. *Id.,* 20 Cal.Rptr. at 635, 370 P.2d at 339. Souza filed a cross-

complaint alleging several causes of action, including negligent and intentional misrepresentation. *Id.* The city raised sovereign immunity as a defense. *Id.* The California Supreme Court held that sovereign immunity was inapplicable because "[w]hen the state makes a contract with an individual, it is liable for a breach of its agreement in like manner as an individual, and the doctrine of governmental immunity does not apply." *Id.; see People ex rel. Department of Parks and Recreation v. West–A–Rama, Inc.,* 35 Cal.App.3d 786, 111 Cal.Rptr. 197 (1973) (state park concessionaire permitted to file cross-complaint against State of California for contract claim).[29]

■■■ I have found no California case dealing with setoff against the state. I will, therefore, look to federal law for some guidance on this issue.

Similar to California, the United States cannot be sued without its consent. *United States v. Agnew,* 423 F.2d 513, 514 (9th Cir. 1970). The United States has given its consent to be sued on an express or implied contract theory under 28 U.S.C. § 1346(a)(2) (the "Tucker Act").[30] This consent does not address waiver of sovereign immunity when the claim is asserted as a counterclaim or cross-complaint. The traditional view is to construe a waiver of sovereign immunity narrowly to ensure that the government is only sued in a manner consistent with its express consent. 6 Charles A. Wright et al., *Federal Practice and Procedure* § 1427, at 201 and n. 17 (1990). The trend has been changing, however, as more and more courts are permitting counterclaims against governmental plaintiffs. *See, e.g., United States v. Silverton,* 200 F.2d 824, 827 (1st Cir.1952); *United States v. Bursey,* 515 F.2d 1228 (5th Cir. 1975); *United States v. One Chevrolet Impa-*

---

**28.** The *Harsh* case is not applicable here because *Harsh* did not involve a setoff against the state. Rather, the taxpayer was asserting that it was entitled to deduction of its state taxes under federal law. *Harsh,* 262 F.2d at 627. The court held that the taxpayer's claim was not a setoff, but rather an affirmative defense and presented no sovereign immunity issue. *Id.* at 628.

**29.** In both *Souza* and *West–A–Rama,* the parties were allowed to bring a cross-complaint against

the state without citing any statute authorizing the actions.

**30.** Pursuant to § 1346(a)(2), the district courts shall have original jurisdiction of "[a]ny other civil action or claim against the United States, not exceeding $10,000 in amount, founded either upon the Constitution, or any act of Congress, or any regulation of an executive department, or upon any express or implied contract...."

*la Convertible,* 475 F.2d 882 (6th Cir.1973). Nevertheless, "even those courts denying defendant the right to counterclaim for affirmative relief have allowed him to assert the claim as a setoff to the extent that it defeats the government's claims." Wright, *supra,* at 202. The Ninth Circuit has adopted this position. *United States v. Agnew,* 423 F.2d 513, 514 (9th Cir.1970). In *Agnew,* the General Services Administration ("GSA") conducted an automobile auction in 1965. *Id.* At the auction, Agnew purchased a 1962 Studebaker for $331. *Id.* Agnew delivered a check for $66 and a letter stating that he was offsetting the balance against the amount GSA owed him in connection with a truck he had previously purchased from GSA. *Id.* The United States filed a complaint against Agnew to recover the remainder of the purchase price, and Agnew filed a counterclaim for breach of warranty in connection with the earlier transaction. *Id.* The Ninth Circuit held that Agnew's counterclaim was improper because:

> The United States cannot be sued without its consent. The filing of a suit in the name of the United States does not amount to a waiver of sovereign immunity subjecting the United States to an affirmative adverse judgment on a counterclaim filed by a defendant.

*Id.* Although the Ninth Circuit upheld the United States' motion to dismiss Agnew's counterclaim, it, nevertheless, allowed Agnew to set off to defeat the government's recovery. *Id.*

Because California law allows a cross-complaint in a contract action and federal law recognizes a setoff, I believe California law will allow setoff against the state in transactions between the same parties involving express contracts.

FNMA also argues that by filing chapter 9, the County has waived its right to sovereign immunity under Code § 106(a)(1).[31] FNMA is wrong because Code § 106(a) is not a state statute that authorizes a suit against the State of California.

FNMA further contends that its right of setoff arises under Code § 506(a).[32] Again, FNMA errs because § 506(a) governs the extent to which a creditor's claim is secured; it does not create a substantive right to setoff.

In summary, California has waived sovereign immunity to a setoff in contractual transactions. This is so because there is no practical difference between asserting a counterclaim or a setoff as a defense to a governmental claim. Therefore, FNMA can assert a setoff against the County and the School Districts provided that it satisfies the legal requirements for a setoff.

**C. Section 8103 of the California Commercial Code is not applicable.**

The County argues that FNMA's assertion of a setoff right is improper because it represents an invalid "Issuer's Lien" under Division 8 of the California Commercial Code.

Division 8 governs the issuance of uncertificated securities like the FNMA Notes.[33] The purpose of Division 8 is to encourage the negotiability of investment securities. *Bank of Honolulu v. Hawaii Corporation (In re Hawaii Corp.),* 829 F.2d 813, 815 (9th Cir. 1987). Section 8103(b) of the California

---

**31.** Section 106(a)(1) provides: "Notwithstanding an assertion of sovereign immunity, sovereign immunity is abrogated as to a governmental unit to the extent set forth in this section with respect to the following: (1) Sections ... 553...."

**32.** Section 506(a) provides:

> An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim.

**33.** The FNMA Notes qualify as uncertificated securities under U.C.C. § 8–102(b). UCC § 8–102(b) defines an "uncertificated security" as an obligation of the issuer which is:

> (i) Not represented by an instrument and the transfer of which is registered upon books maintained for that purpose by or on behalf of the issuer;
> (ii) Of a type commonly dealt in on securities exchanges or markets.

Commercial Code prevents an issuer of an uncertificated security from asserting a "lien upon a security in favor of an issuer" unless "a notation of the right of the issuer to the lien is contained in the initial transaction statement sent to the purchaser...." The County contends that § 8103 invalidates FNMA's purported setoff because (1) an issuer's setoff right is a "lien upon a security in favor of an issuer"; and (2) the initial transaction statements for the FNMA Notes did not note any right of setoff.

The question, therefore, is whether a right of setoff is a lien. In general, there are three types of liens:[34] security interests, judicial liens and statutory liens. H.R. 595, 95th Cong., 1st Sess. 312 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 25 (1978). These liens are mutually exclusive and are exhaustive, except for certain common law liens.[35]

A right of setoff does not fit within any of these three categories. Pursuant to Code § 101(51), a security interest is defined as a "lien created by an agreement." The defining element of a security agreement is that it is consensual. *See United States v. Ron Pair Enterprises*, 489 U.S. 235, 240, 109 S.Ct. 1026, 1029, 103 L.Ed.2d 290 (1989). A right of setoff does not, however, require the consent of both parties. Instead, it is a "nonconsensual, self-help remedy...." 3 *Norton Bankruptcy Law and Practice* § 63.3 at 63–17 (2d ed. 1994). Accordingly, a right of setoff is not a security interest.[36]

Similarly, a right of setoff is neither a judicial lien nor a statutory lien. A judicial lien is a "lien obtained by judgment, levy, sequestration, or other legal or equitable process or proceeding...." Code § 101(36). A right of setoff is not a judicial lien because it does not arise through any legal or equitable proceeding. A statutory lien is a "lien arising solely by force of a statute on specified circumstances or conditions...." Code § 101(53). A right of setoff is not a statutory lien because it does not arise solely by force of a statute but, instead, arises under equitable principles.

The California courts have also recognized that a right of setoff is not a lien. A lien is defined as "a legal claim or charge on property, either real or personal, as security for the payment for some debt or obligation...." *Gray v. Horne*, 48 Cal.App.2d 372, 119 P.2d 779 (1941). In contrast, "[t]he right to setoff is a long established principle of equity. Either party to a transaction involving mutual debits and credits can strike a balance, holding himself owing or entitled only to a net difference." *Carmel Valley Fire Protection Dist. v. State of California*, 190 Cal.App.3d 521, 234 Cal.Rptr. 795 (1987), citing, *Kruger v. Wells Fargo Bank*, 11 Cal.3d 352, 113 Cal.Rptr. 449, 455, 521 P.2d 441, 447 (1974). In *Kruger*, the defendant bank notified Kruger that it was asserting a "lien" upon her account. *Id.*, 113 Cal.Rptr. at 450, 521 P.2d at 442. Kruger then filed a complaint attacking the constitutionality of California Civil Code § 3045, the Banker's Lien Act. *Id.* at 451, 521 P.2d at 443. The California Supreme Court held that the Bank's actions did not involve § 3045 because its "lien" on Kruger's deposits was not technically a "lien" at all, but instead a right of setoff, based on equitable principles. *Id.*

An issuer's lien is also unlike a setoff because an issuer's lien is a legal remedy, while setoff has its foundation in equity. A valid issuer's lien must comport with the specific statutory requirements of § 8103. If all of these criteria are met, the court must recognize its validity. In contrast, a setoff is an equitable remedy which, when properly invoked, still rests in the discretion of the

---

**34.** Code § 101(37) provides: " '[L]ien' means charge against or interest in property to secure payment of a debt or performance of an obligation...."

**35.** Common law liens are not specifically defined by the Code. Some examples include artisan and attorney retaining liens. *See Matter of Matassini*, 90 B.R. 508, 509 (Bankr.M.D.Fla.1988). Common law liens are not relevant here.

**36.** In contrast to a right of setoff, a valid issuer's lien is consensual. Pursuant to § 8103, an issuer's lien is valid only if it is noted in the initial transaction statement. This statement must then be delivered to the registered owner or pledgee to ensure that the purchaser has consented to the lien when it purchases the security. This notice requirement reflects the overriding objective of UCC Article 8 which is to confer negotiability on securities governed by it. *Hawaii Corp.*, 829 F.2d at 815.

court. *Cumberland Glass Manufacturing Co. v. De Witt*, 237 U.S. 447, 455, 35 S.Ct. 636, 639, 59 L.Ed. 1042 (1915).

Based on the foregoing, it is clear that, in California, a lien is not synonymous with a right or setoff. I am unwilling to broaden the definition of lien to include a setoff without some clear guidance from the California courts.[37]

### D. Section 8105 of the California Commercial Code is not applicable.

■ The County also contends that FNMA cannot assert its purported setoff right because setoff is not a proper defense under § 8105 of the California Commercial Code. Pursuant to § 8105(3)(c): "If signatures on a certificated security are admitted or established, production of the security entitles a holder to recover on it unless the defendant establishes a defense or a defect going to the validity of the security." The County cites *E.H. Hinds, Inc. v. Coolidge Bank & Trust Co.*, 6 Mass.App.Ct. 5, 372 N.E.2d 259 (1978) in support of its argument.[38]

The County overstates the holding of *Hinds*. Contrary to the County's contention, the *Hinds* court specifically recognized the right of setoff: "A right of setoff may be availed of by a defendant to reduce (even to zero) the amount he would otherwise have to pay in order to satisfy the plaintiff's claim. . . ." *Id.* at 11, 372 N.E.2d 259. This defense, however, is not a defense to a third party's claim. *Id.* This case is distinguishable from *Hinds* because FNMA is not asserting a setoff against a third party.

Further, this case does not implicate § 8105 because FNMA is not questioning the validity of the County Notes. Indeed, by asserting its right of setoff, FNMA implicitly acknowledges the County's claim. Therefore, § 8105 is not applicable here.

### E. It would be inequitable to allow FNMA to assert a setoff against the OCIP.

■ Here, FNMA is attempting to setoff its debt to the OCIP on the FNMA Notes against the County and School Districts' debts to FNMA. If I allow this, 190 OCIP participants will bear the County and School Districts' debts. This is clearly unfair, inappropriate and inequitable.[39]

### CONCLUSION

In summary, FNMA may not setoff its obligations on the FNMA Notes against the County and School Notes. The $118.5 million being held in escrow shall be turned over to the County ($90 million) and the School Districts ($28.5 million).[40]

---

37. *See also, Marley v. United States*, 381 F.2d 738, 743, 180 Ct.Cl. 898 (1967),

A "setoff" and a "lien" connote independent concepts, governed by distinct legal principles . . . [a setoff pertains to] 'situations where both plaintiff and defendant have independent causes of action maintainable against each other in separate actions which can be mutually deducted whenever either one brings suit against the other.' On the other hand, a lien has been construed as 'a charge or encumbrance upon property to secure the payment or performance of a debt, duty, or other obligation. It is distinct from the obligation which it secures.'
(citations omitted).

38. In *Hinds*, a bank issued debentures to its directors to raise its capital account. *Id.* at 6, 372 N.E.2d 259. Some of the directors did not have the monies necessary to purchase the shares and, therefore, borrowed the necessary funds from E.H. Hinds. *Id.* In return, the directors issued promissory notes to E.H. Hinds, as well as bank-issued debentures. *Id.* The directors defaulted on their promissory notes and

E.H. Hinds demanded payment from bank on the debentures. *Id.* at 8, 372 N.E.2d 259. Bank refused, asserting that the directors were indebted to the Bank in amounts far greater than the value of E.H. Hinds' claim. *Id.*

39. *See* 4 *Collier, supra,* ¶ 553.04 at 553–25 n. 18, *citing Morris v. Windsor Trust Co.*, 213 N.Y. 27, 29–30, 106 N.E. 753 (1914) (then Judge Cardozo):

I think the set-off is without sanction, either statutory or equitable. A wrongdoer who has misapplied the subject of a trust is not entitled, either under the Bankruptcy Act or under rules of equitable set-off, to apply a credit that belongs to him in his own right in cancellation of his liability as a fiduciary.

40. On May 2, 1995, I approved a Comprehensive Settlement Agreement ("CSA") that resolved all issues between the non-County participants in the OCIP and the County. Section 6 of the CSA provides that the cash distributions to the County and the School Districts would be reduced to

This memorandum opinion constitutes my findings of fact and conclusions of law.

## ORDER

In accordance with the findings of fact and conclusions of law set forth in my memorandum opinion of this date, it is

ORDERED that FNMA may not setoff its obligations on the FNMA Notes against the County and School Notes. The $118.5 million being held in escrow shall be turned over to the County ($90 million) and the School Districts ($28.5 million).

reflect FNMA's setoff claims. In return, if the County and the School Districts prevailed against FNMA, the $118.5 million held in escrow would be distributed to the County and the School Districts according to their interests.