In re LUZ INTERNATIONAL,
LTD., Debtor.

Samuel R. BIGGS, Chapter
7 Trustee, Appellant,

v.

William STOVIN, and other interested un-
derwriters at Lloyd's, London and other
U.K. insurance companies; Luz Interna-
tional, LTD., Appellees.

BAP No. CC–96–1887–JHT.

Bankruptcy No. LA–91–10000 AA.

United States Bankruptcy Appellate Panel
of the Ninth Circuit.

Argued and Submitted May 22, 1997.

Decided Feb. 25, 1998.

Thomas M. Geher, Seror & Levine, Woodland Hills, CA, for appellant.

Julia W. Brand, Katten Muchin & Zavis, Los Angeles, CA; for William Stovin.

Before: JONES, HAGAN, and TCHAIKOVSKY,[1] Bankruptcy Judges.

## OPINION

JONES, Bankruptcy Judge.

The Debtor's chapter 7[2] trustee appeals from an order granting a creditor relief from the automatic stay and allowing the creditor to set off certain funds contained in a cash collateral account. The trustee claims the

---

1. Hon. Leslie J. Tchaikovsky, Bankruptcy Judge for the Northern District of California, sitting by designation.

2. Unless otherwise indicated, all references to Chapters, Sections and Rules are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, and to the Federal Rules of Bankruptcy Procedure, Rules 1001, *et seq.*

bankruptcy court committed two principal errors, one procedural, the other substantive. First, the trustee argues that the bankruptcy court improperly adjudicated the merits of the setoff claim in the context of a motion for relief from stay. Second, the trustee contends that the bankruptcy court erred in finding that the creditor met the statutory requirements for setoff. Because we hold the bankruptcy court erred in both respects, we **REVERSE** the bankruptcy court and **REMAND** for further proceedings consistent with this opinion.

## I. FACTS

The relevant facts are undisputed. From 1979 through 1991, the Debtor, Luz International Limited ("Debtor" or "LIL") and some of its wholly owned subsidiaries, Luz Engineering Corporation ("LEC"), Luz Partnership Management, Inc. ("LPM"), LPM VII, Inc. ("LPM VII"), and Luz Industries Israel, Ltd. ("Luz Israel"), were engaged in the development, construction, financing and management of commercial-scale solar electric generating systems ("SEGS"), located in the Mojave desert.

As part of the sale of the SEGS to private purchasers, Luz Israel provided each purchaser with an agreement guaranteeing, among other things, certain levels of performance by the SEGS (the "Performance Warranty"). Debtor and LEC also provided the purchasers with an agreement guaranteeing certain tax treatment in connection with the SEGS (the "Tax Warranty").

To secure Luz Israel's obligations under the Performance Warranty, Debtor and Luz Israel obtained letters of credit (the "Performance LC") in the amount of $32,842,105 from Manufacturers Hanover Trust ("MHT").[3] To secure its obligations under the Tax Warranty, Debtor obtained another letter of credit from MHT in the amount of $12,658,681 (the "Tax LC").

### The Performance Indemnities

On April 15, 1989, a group of underwriters (the "Performance Underwriters"), among whom were "William Stovin and Other Inter-

ested Underwriters at Lloyd's, London and Other U.K. Insurance Companies" (the "Appellees"), provided certain indemnity policies ("Performance Indemnity Policies") to MHT. Under the Performance Indemnity Policies the Performance Underwriters agreed to indemnify MHT for all draws made on the Performance LC.

That same day Debtor, Luz Israel, LPM and LPM VII entered into a counter-indemnity agreement with the Performance Underwriters (the "Performance Counter–Indemnity Agreement") whereby the companies agreed to indemnify the Performance Underwriters for all losses sustained under the Performance Indemnity Policies. Under the Performance Counter–Indemnity Agreement, Debtor and Luz Israel agreed to, among other things: (1) indemnify and hold harmless the Performance Underwriters for all losses sustained under the Performance Indemnity Policies and (2) to provide the Performance Underwriters with, and maintain thereafter, cash collateral equal to three hundred percent (300%) of the Performance Underwriters' maximum probable loss under the Performance Indemnity Policies. To secure this obligation Debtor and Luz Israel deposited $2,250,000 in a cash collateral account (the "Performance Cash Collateral Account").

### The Tax Indemnities

Over eight months later, on December 27, 1989, another group of underwriters, including the Appellees, (the "Tax Underwriters") provided certain Tax Indemnity Policies ("Tax Indemnity Policies") to MHT. Under the Tax Indemnity Policies the Tax Underwriters agreed to indemnify MHT for all draws made on the Tax LC.

That same day Debtor, LEC, LPM and LPM VII entered into five counter-indemnity agreements with the Tax Underwriters (the "Tax Counter–Indemnity Policies"). Under the Tax Counter–Indemnity Policies, Debtor and LEC agreed, among other things, to indemnify and hold harmless the Tax Under-

---

**3.** We note for the record that MHT merged with Chemical Bank which then merged with Chase Manhattan Bank. The combined banks now operate under the name of Chase Manhattan Bank. However, for continuity with the record, we will refer to the bank only as MHT.

writers for any losses incurred under the Tax Indemnity Policies.

To secure its obligation under the Tax Counter–Indemnity Policies, Debtor deposited $650,000 in its name at Security Trust Company (the "Tax Cash Collateral Account"). Luz, Security Trust Company and the Tax Underwriters' nominee, Underwriters Security (II) Limited ("USL II"), entered into a cash collateral agreement (the "Tax Cash Collateral Agreement") concerning the Tax Cash Collateral Account. Pursuant to the Tax Cash Collateral Agreement, Debtor retained title to the $650,000 on deposit with Security Trust Company and was considered the owner of the money for "any federal income tax purposes." However, the money in the account was subject to a "first security interest in favor of USL II" (the "Tax Security Agreement"). Under the Tax Security Agreement, USL II has the right to withdraw from the Tax Cash Collateral Account any and all amounts due and payable to the Tax Underwriters under the Tax Counter–Indemnity Policies.

On July 26, 1991, four months before Debtor filed its chapter 7 case, MHT filed claims with the Performance Underwriters totaling $2,458,085. The Performance Underwriters issued a demand for payment on Debtor on July 30, 1991. Thereafter, on August 5, 1991, the Performance Underwriters directed the withdrawal of the entire $2,250,000 held in the Performance Cash Collateral Account. The remaining $208,085 was paid to MHT by the Performance Underwriters on September 6, 1991. On November 25, 1991, Debtor filed its chapter 7 petition. Following Debtor's petition, the Performance Underwriters continued to suffer unreimbursed losses on the Performance Indemnity Policies. Post-petition losses on the Performance Indemnity Policies total $17,933,424. However, MHT has not made any demand on the Tax Underwriters. Consequently, at the beginning of this litigation, the Tax Cash Collateral Account still contained the full $650,000 originally deposited.

On June 18, 1996, the Appellees filed a "Motion for Relief from Automatic Stay to Setoff Cash Collateral Account Against Unreimbursed Losses Pursuant to 11 U.S.C. § 362(a)." In the motion the Appellees sought relief from stay and authorization to set off their indemnity claim under the Performance Counter–Indemnity Agreement against the funds in the Tax Cash Collateral Account. The chapter 7 trustee opposed the motion. After a hearing on the motion held on August 6, 1996, the bankruptcy court granted the motion and authorized the Appellees to set off and receive $550,295 of the $650,000 that Debtor had deposited in the Tax Cash Collateral Account.[4] The bankruptcy court entered its order on August 29, 1996. On September 6, 1996, the trustee timely filed a Notice of Appeal.

## II. ISSUES

Whether the bankruptcy court erred in making a determination of the merits of Appellees' setoff claim during a hearing on the motion for relief from stay?

Whether the bankruptcy court erred in allowing the Appellees to set off $550,295 from the Tax Cash Collateral Account against liabilities incurred under the Performance Indemnity Policies?

## III. STANDARD OF REVIEW

Whether to allow setoff pursuant to § 553 is left to the sound discretion of the bankruptcy court. *In re HAL, Inc.,* 196 B.R. 159, 161 (9th Cir. BAP 1996), *aff'd,* 122 F.3d 851 (9th Cir.1997); *In re Cascade Roads, Inc.,* 34 F.3d 756, 763 (9th Cir.1994). However, when the facts are established and the rule of law is undisputed, whether the facts satisfy the legal rule is a mixed question of fact and law. *Pullman–Standard v. Swint,* 456 U.S. 273, 289 n. 19, 102 S.Ct. 1781, 1791 n. 19, 72 L.Ed.2d 66 (1982); *In re Eastman,* 188 B.R. 621, 624 (9th Cir. BAP 1995); *Moss v. Commissioner,* 831 F.2d 833, 838 n. 9 (9th Cir.1987). We review mixed questions of fact and law de novo. *In re Eastman,* 188 B.R. at 624; *Boone v. United States,* 944

4. The lesser amount was represented to be the allocable portion of the Tax Cash Collateral Account securing claims of insurers who participated in underwriting both the Tax Warranty and the Performance Warranty.

F.2d 1489, 1492 (9th Cir.1991). Questions of contract interpretation are subject to de novo review. *In re Ankeny*, 184 B.R. 64, 65 (9th Cir. BAP 1995).

## IV. DISCUSSION

A. *The Bankruptcy Court Improperly Adjudicated The Merits Of Appellees' Setoff Claim In The Limited Context Of A Motion For Relief From The Automatic Stay*

As soon as a petition in bankruptcy is filed, the automatic stay provisions of § 362 take effect, preventing all prepetition creditors from taking actions to collect their debts. To ensure that questions concerning setoff are presented to the bankruptcy court for determination, § 362(a)(7) specifically stays "the setoff of any debt owing to the debtor that arose before the commencement of the case under this title against any claim against the debtor." 11 U.S.C. § 362(a)(7) (1994). The automatic stay does not defeat the right of setoff, rather it "merely stays its enforcement pending an orderly examination of the debtor's and creditor's rights." *In re Pieri*, 86 B.R. 208, 210 (9th Cir. BAP. 1988) (citing H.R.Rep. No. 95–595 at 342 (1977), *reprinted in* 1978 U.S.C.C.A.N. at 5787, 6298).

However, once a creditor demonstrates adequate grounds for relief from stay, the bankruptcy court may grant relief from stay pursuant to § 362(d). After relief from stay is granted the creditor may pursue its claims against the debtor without incurring liability for violation of the stay. *Pieri*, 86 B.R. at 210; *Grella v. Salem Five Cent Sav. Bank*, 42 F.3d 26, 33–34 (1st Cir.1994) (explaining that relief from the stay is "merely a grant of permission from the court allowing the creditor to litigate its substantive claims elsewhere without violating the automatic stay").

In the present case, the Appellees moved for relief from the automatic stay for cause under § 362(d)(1). The Appellees contended that cause existed for granting relief from stay because, if the bankruptcy court did not grant relief from the stay, the Underwriters would suffer economic hardship due to the fact that Appellees would be deprived of the ability to exercise their setoff rights. The trustee filed an opposition to the motion for relief from stay.

On August 6, 1996, the bankruptcy court heard arguments on the motion and granted the Appellees' motion for relief from stay. However, in addition to granting relief from stay, the court made a determination on the merits of the setoff claim and authorized the Appellees to immediately set off and receive $550,295 of the $650,000 which Debtor had deposited in the Tax Cash Collateral Account. This adjudication on the merits constitutes the trustee's first assignment of error. The trustee does not argue that the bankruptcy court erred in granting relief from stay, but does contend that the bankruptcy court erred in making a final determination that the Appellees were entitled to setoff when all that was before the court was a motion for relief from stay. In order to determine whether the bankruptcy court improperly decided that Appellees were entitled to set off funds from the Tax Cash Collateral Account during its ruling on the motion for relief from stay, we must examine the purpose and scope of a motion for relief from stay.

1. *Case law interpreting the scope of a § 362 motion for relief from stay hearing holds that the hearing is summary in nature.*

"The hearing on a motion for relief from stay is meant to be a summary proceeding, and the statute requires the bankruptcy court's action to be quick." *Grella*, 42 F.3d at 31 (citing *Matter of Vitreous Steel Prods. Co.*, 911 F.2d 1223, 1232 (7th Cir.1990)). Section 362(e) provides that the bankruptcy court must hold a preliminary hearing on a motion for relief from stay no later than thirty days after the motion is filed or "such stay is terminated with respect to such party in interest making such request." 11 U.S.C. § 362(e) (1994). Furthermore, § 362(e) requires that the court conclude a final hearing on the motion for relief from stay no later than thirty days from the conclusion of the preliminary hearing unless, due to compelling circumstances, the parties consent to an extension for a specified period of time.

Given the limited grounds for obtaining a motion for relief from stay, read in conjunction with the expedited schedule for a hearing on the motion, most courts hold that motion for relief from stay hearings should not involve an adjudication of the merits of claims, defenses, or counterclaims, but simply determine whether the creditor has a colorable claim to the property of the estate. *See In re Johnson,* 756 F.2d 738, 740 (9th Cir.), *cert. denied,* 474 U.S. 828, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985) ("Hearings on relief from the automatic stay are thus handled in a summary fashion. The validity of the claim or contract underlying the claim is not litigated during the hearing.") (citation omitted); *In re Ellis,* 60 B.R. 432, 436 (9th Cir. BAP 1985) ("In any case, stay litigation is not the proper vehicle for determination of the nature and extent of those rights."); *Grella,* 42 F.3d at 33 ("[W]e find that a hearing on a motion for relief from stay is merely a summary proceeding of limited effect, and . . . a court hearing a motion for relief from stay should seek only to determine whether the party seeking relief has a colorable claim to property of the estate."); *see also,* 3 *Collier on Bankruptcy* ¶ 362.08[6], 362–106 (15th ed. rev.1997) [hereinafter *Collier* ].

These courts hold that the expedited nature of a motion for relief from stay limits the court's ability to make a full adjudication of the merits of the parties' claims. This interpretation closely tracks the legislative history of § 362.

2. *Section 362's legislative history emphasizes the expedited nature and limited scope of the hearing on a motion for relief from stay.*

The House of Representatives report on § 362 notes that the hearing on the motion for relief from stay is of limited scope and is to be handled expeditiously by bankruptcy courts.

At the expedited hearing under subsection (e), and at all hearings on relief from the stay, the only issue will be the claim of the creditor and the lack of adequate protection or existence of other cause for relief from the stay. This hearing will not be the appropriate time at which to bring in other issues such as counterclaims against the creditor on largely unrelated matters. *Those counterclaims are not to be handled in the summary fashion that the preliminary hearing under this provision will be.* Rather, they will be the subject of more complete proceedings by the trustee to recover property of the estate or to object to the allowance of a claim.

H.R.Rep. No. 95–595 at 344 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6300 (emphasis added). The Senate report adopts this explanation, but also adds the following:

However, this would not preclude the party seeking continuance of the stay from presenting evidence on the existence of claims which the court may consider in exercising its discretion. *What is precluded is a determination of such collateral claims on the merits at the hearing.*

S.Rep. No. 95–989 at 55, *reprinted in* 1978 U.S.C.C.A.N. 5787, 5841 (emphasis added).

■ The legislative history further emphasizes the cursory nature of a motion for relief from stay by analogizing the automatic stay to a preliminary injunction.

Because the stay is essentially an injunction, the three stages of the stay may be analogized to the three stages of an injunction. The filing of the petition which gives rise to the automatic stay is similar to a temporary restraining order. The preliminary hearing is similar to the hearing on a preliminary injunction, and the final hearing and order is similar to a permanent injunction.

H.R.Rep. No. 95–595, at 344 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6300. This statutory history clarifies and limits the purpose of the motion for relief from hearing. The hearing is not, nor was it intended to be, the forum in which to determine the merits of the claims presented in support of relief from the automatic stay. Rather the motion for relief from stay hearing is merely a threshold requirement which, if met by the creditor, allows a creditor to fully pursue its claims against the debtor without incurring liability for violating the automatic stay.

■ In the present case, the Appellees filed a motion for relief from stay in order to

set off certain funds contained in the Tax Cash Collateral Account. Appellees presented documentary evidence that supported its position that relief from stay should be granted. The Appellant opposed the motion. When the bankruptcy court rendered its decision, the bankruptcy court did not limit its ruling to granting relief from the stay so that the Appellees could file an adversary action seeking setoff. Rather, the bankruptcy court granted the final relief sought by the Appellees, namely the right to immediately set off and receive the money on the Tax Cash Collateral Account. Given the case law and legislative history regarding the proper scope of a motion for relief from stay, we hold that the bankruptcy court erred by determining the merits of the Appellees' setoff claim during the hearing on the motion for relief from stay.

When the Appellant opposed the motion for relief from stay, the Appellant argued that Appellees must bring an adversary action in order to obtain setoff. While an adversary action is not required for every motion for relief from stay, in this particular case the setoff motion required adjudication of complex financial arrangements and underwriting agreements. Further, the relief sought required a third party, namely USL II, to release certain funds under its control. Adjudication of the merits of such a complex claim is inconsistent with the accelerated hearing schedule proscribed for a motion for relief from stay.

Given the complexity of the financial arrangements, the fact that the relief sought by Appellees required a third party to the proceedings to release funds to the prevailing party, and the accelerated hearing schedule for a motion for relief from stay, it was error for the bankruptcy court to make a final adjudication of the setoff motion in the context of a motion for relief from stay. Therefore, we **REVERSE** the judgment of the bankruptcy court.

Nevertheless, on appeal the trustee has had the opportunity to argue that the bankruptcy court erred in its substantive ruling that the Appellees were entitled to set off certain funds in the Tax Cash Collateral Account. The Appellees have countered with substantive arguments of their own that the bankruptcy court properly decided the setoff claim. As the parties have made their respective positions known, this panel is in a position to rule on Appellee's substantive setoff motion notwithstanding our ruling that the bankruptcy court committed procedural error in determining the parties setoff rights in the context of a motion for relief from stay. We hold that the bankruptcy court also erred in its substantive ruling that the Appellees were entitled to set off the funds contained in the Tax Cash Collateral Account.

B. *The Bankruptcy Court Erred In Concluding That The Appellees Met The Statutory Requirements For Setoff*

A creditor's ability to set off a debt owed to a debtor against a claim the creditor has against the debtor is governed by § 553. Section 553(a) reads:

> Except as otherwise provided in this section and in sections 362 and 363 of this title, this title does not affect any right of a creditor to offset a mutual debt owing by such creditor to the debtor that arose before the commencement of the case under this title against a claim of such creditor against the debtor that arose before the commencement of the case....

11 U.S.C. § 553(a) (1994). Because § 553 refers to a "right to offset a mutual debt ... that arose before the commencement of the case," § 553 does not create a right of setoff, but merely preserves a creditor's setoff rights under applicable nonbankruptcy law. *In re HAL, Inc.,* 196 B.R. 159, 161 (9th Cir. BAP 1996); 5 *Collier,* at 553–8. To enforce a setoff right, "[a creditor] must establish that (1) it has a right of setoff under nonbankruptcy law; and (2) this right should be preserved in bankruptcy under § 553." *In re County of Orange,* 183 B.R. 609, 615 (Bankr.C.D.Cal.1995).

In determining whether the right to setoff should be preserved in bankruptcy under § 553, the party asserting setoff must demonstrate the following: (1) the debtor owes the creditor a prepetition debt; (2) the creditor owes the debtor a prepetition debt; and (3) the debts are mutual. *Westamerica*

*Bank v. United States,* 178 B.R. 493, 495 (Bankr.N.D.Cal.1995) (citing *Braniff Airways, Inc. v. Exxon Co., USA,* 814 F.2d 1030, 1034 (5th Cir.1987)); 5 *Collier,* ¶¶ 553.01–03.

In the present case, the trustee does not dispute that New York law recognizes a creditor's setoff right or that the Debtor owed a prepetition debt to the Appellees under the Performance Counter–Indemnity policies. Therefore, the only issues on appeal are whether the bankruptcy court erred in holding that the creditor owed the Debtor a prepetition debt and whether the bankruptcy court erred in holding these debts were mutual.

1. *The bankruptcy court erred in holding that the creditor owes a Prepetition debt to the Debtor.*

Setoff under § 553 requires that the creditor owe a prepetition debt to the debtor. *Westamerica Bank,* 178 B.R. at 495. The Bankruptcy Code defines a "debt" as "liability on a claim" 11 U.S.C. § 101(12) (1994). A "claim" is defined as "a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured...." 11 U.S.C. § 101(5) (1994). Thus, a claim as a "right to payment" is "intended to encompass virtually any type of obligation reducible to some monetary equivalent." 5 *Collier,* at 553–13.

■ The trustee asserts that there is no prepetition debt owing from the Appellees to the Debtor under the Tax Cash Collateral Agreement and Tax Security Agreement which would trigger the Appellees' setoff right. Conversely, the Appellees assert that certain of its obligations with respect to these agreements rise to the level of a debt. As both the trustee and the Appellees look to the Tax Cash Collateral Agreement and Tax Security Agreement for support of their respective arguments, we begin our analysis with those contracts.

The Tax Cash Collateral Agreement was executed on December 27, 1989. The agreement named USL II as nominee of certain underwriters who had subscribed to the Tax Indemnity Policies. Section 4(a) of the agreement states that: (1) "LIL shall hold legal title to the CCA [cash collateral account], subject to a first security interest in favor of USL II ..." (2) "USL II shall have sole authority with respect to withdrawal of funds in the CCA" and (3) "LIL shall be treated as the owner of the CCA for federal income tax purposes." Section 4(b) informs the bank, Security Trust, that "LIL has pledged and granted to USL II a first security interest in CCA Property as security for the payment of all amounts due and to become due to Underwriters under various Counter–Indemnity Agreements and the Security Agreement." Section 5(f) provides that "[u]pon receipt of written notice from USL II that the CCA has terminated, Security Trust is authorized to pay the entire balance of the CCA to LIL or as LIL may direct in writing."

The Tax Security Agreement, executed on the same day, states that the "Underwriters have subscribed to five (5) Tax Indemnities ('Policies')" and that "in conjunction with each of these Policies, LIL and various affiliated companies have executed Counter–Indemnity Agreements...." The Tax Security Agreement gave USL II only the right to "withdraw from the CCA any and all amounts due or payable to Underwriters under the Counter–Indemnities ." However, the Tax Security Agreement also claimed to give USL II "sole dominion and control" over the CCA.

Noting the language in the various agreements, the trustee argues that Debtor retained title to the CCA, as evidenced by the language in the agreements stating that Debtor holds legal title to the CCA and owns the CCA for federal income tax purposes. The trustee argues that while this case might be very different if the funds were on deposit with USL II rather than a third party, the Debtor in this case merely granted USL II a first priority security interest in the CCA. As such, the Debtor continued to own the money in the account, and therefore the obligation of USL II to release its security interest in the funds on specified conditions does not constitute a debt owing from USL II to the Debtor.

Conversely, Appellees argue that the Debtor merely holds "bare legal title." The Appellees cling to the "sole dominion and control" language of the Tax Security Agreement, arguing that they have authority to withdraw funds from the CCA and exclusive authority to terminate the CCA. The Appellees argue that any demand for relinquishment of control over the Tax Cash Collateral Account constitutes a "claim" against the Appellees for purposes of § 553 and that this claim will arise when the Tax Counter–Indemnity Policies expire without loss.

After consideration of the respective arguments, we hold that the Appellees "duty" to notify Security Trust of the expiration of their security interest is not a "right to payment" owing to the Debtor under § 553. The fact remains that the money in the account was already owned by the Debtor. Therefore, the "debt," if any, is owed from Security Trust, as depository of the Debtor's funds, to the Debtor, not from the Appellees who merely hold a security interest in those funds.

Further, the Security Agreement clearly states that Debtor holds legal title to the CCA and that Debtor must pay any federal income tax assessed against the CCA. The Appellees claim of "sole dominion and control" is restricted by the additional language of the agreement which limits the Appellees' right to withdraw funds from the CCA to only those instances in which the Tax Underwriters have sustained a loss under the Tax Indemnity Policies. The Appellees cannot credibly claim to have unrestricted "sole dominion and control" over the CCA if the Appellees' ability to withdraw the funds is narrowly circumscribed.

■ A creditor cannot create a right of offset for its claim against a debtor by refusing to reconvey security for a separate and independently secured debt which has been paid in full. Similarly, although a creditor may cross-collateralize separate debts owing them from the same debtor, where the creditor fails to do so the creditor cannot create de facto cross-collateralization by refusing to reconvey collateral for a fully paid secured debt and claiming the right of offset against their unsecured debt owing from the same debtor.

As a final note, we acknowledge that this case is fundamentally different from one in which a bank holds money for a debtor and then seeks to set off that money against debts owed by the debtor to the bank. In those cases there is a "right to payment" owing from the bank to the debtor as a result of the deposited funds. However, in the present case it is not Security Trust who is attempting to set off the balance in the account but rather the Appellees, a third-party to the depository arrangement. Consequently, the Debtor has no "right to payment" from the Appellees, and there is no debt owing from the Appellees to the Debtor.

2. *The bankruptcy court erred in holding that the debts were mutual.*

In addition to finding that the creditor owes the debtor a prepetition debt, setoff under § 553 requires that the debts owing must be "mutual." The Ninth Circuit has set forth a three-prong test for determining the mutuality of debts. These factors are: "(1) the debts must be in the same right; (2) the debts must be between the same individuals; and (3) those individuals must stand in the same capacity." *In re County of Orange*, 183 B.R. 609, 616 (Bankr.C.D.Cal.1995) (*citing In re Visiting Home Servs., Inc.*, 643 F.2d 1356, 1360 (9th Cir.1981)).

a. *The debts are not in the same right.*

■ Because a prepetition debt is not entitled to the same setoff rights as a postpetition debt, the mutual debts must arise prepetition in order to be in the "same right." *In re County of Orange*, 183 B.R. 609, 616 (Bankr.C.D.Cal.1995) (citing *In re Bay State York Co., Inc.*, 140 B.R. 608, 614 (Bankr.D.Mass.1992)). As discussed in the previous section, the Appellees owe no debt to the Debtor. In the absence of a debt owing from the Appellees, there can not be, as a matter of law, mutual debts owing in the "same right." Therefore, the Appellees have failed to meet the first requirement for mutuality under § 553.

### b. The "debt" is not between the same parties.

The second condition to finding mutuality of debt is that the debt must be owing between the same parties. *In re Visiting Home Servs.*, 643 F.2d at 1360. Exhibit M of the declaration of William Stovin, which is attached to the Appellees' original motion for relief from the automatic stay, lists the parties·who allegedly participated in underwriting the Tax Indemnity Policy. As Appellees' own document demonstrates, many of those parties did not underwrite the Performance Indemnity Policy and therefore sustained no loss enabling them to claim setoff. To circumvent this problem, the Appellees identify those underwriters who participated in both the Tax and Performance Indemnity Policies and seek setoff only for them. In so doing, the Appellees implicitly make the argument that the Tax and Performance Policies were meant to cross-collateralize each other, with a loss sustained on either policy to be set off against the cash collateral account of either. We disagree.

There is no dispute that the only losses sustained were under the Performance Indemnities. Further, the trustee does not dispute that the Performance Underwriters had the authority to withdraw the initial $2,250,000 held in the Performance Cash Collateral Account. The trustee also recognizes that the Performance Underwriters now hold an unsecured claim against Debtor for $17,933,424, representing the unreimbursed losses incurred under the Performance Indemnity. However, the trustee does dispute the authority of the Performance Underwriters to set off losses incurred under the Performance Indemnity against money held in the Tax Cash Collateral Account which was established for the benefit of the Tax Underwriters. The trustee argues that the Performance Underwriters and the Tax Underwriters are two different insurers and cannot constitute the "same party" for setoff purposes.

The Appellees respond that, under the Performance Indemnity and the Tax Indemnity, the underwriters who subscribed to each policy were individually obligated for a percentage share of the losses incurred under the policies. Likewise each individual underwriter was entitled to a percentage share of any recoupments under the policies. The Appellees argue that because the Performance and Tax Underwriters were merely a consortium of individual insurers, each individual insurer held its own rights against the Debtor and could have brought its own motion for relief against the Debtor.

■ Consequently, the Appellees contend that those underwriters who subscribed as both Tax and Performance Underwriters stand in the capacity of an insurer on both policies. Each of the individual Appellees and Debtor were parties to the Performance and Tax agreements which imposed specific indemnification and reimbursements obligations on Debtor if the Performance Underwriters were required to pay any amount to MHT under the policies. Therefore, the Appellees argue that the Performance Indemnities and the Tax Indemnities are merely two parts of the same transaction and the Cash Collateral Accounts were meant to cross-collateralize the obligations under both sets of indemnity agreements. We disagree.

■ A determination of whether the Tax and Performance policies were merely parts of the same transaction and were thus meant to cross-collateralize the Debtor's obligations under both sets of agreements is a question of contract interpretation to be reviewed de novo. *In re Ankeny*, 184 B.R. 64, 65 (9th Cir. BAP 1995). As this question is again grounded in the language of the contracts, we begin our analysis there.

The Performance Indemnity was signed on April 15, 1989, and was to secure Debtor's "Extended Warranty and Performance Guarantee." Section A–9 provides: "The Indemnity [defined as the Performance Indemnity agreement] constitutes the sole agreement between the Underwriters and Insured with respect to the insurance provided hereby, and supersedes any other prior or simultaneous agreements, whether written or oral, between them pertaining to· the subject matter hereof." Throughout the Performance Indemnity agreement reference is repeatedly made to the Performance Warranty but no

reference is ever made to the Tax Warranty or the Tax Indemnity agreements.

The Performance Counter–Indemnity Agreement was entered into for the benefit of the underwriters who "subscribed to five (5) Warranty Indemnities dated April 15, 1989." The Performance Counter–Indemnity Agreement provided for the creation of the Performance Cash Collateral Account and for a security interest in the account in favor of USL, the nominee of the Appellees. The Performance Counter–Indemnity Agreement also makes no mention of the Tax Counter–Indemnity Agreement or the Tax Cash Collateral Account.

The Tax Indemnity Agreement was signed on December 27, 1989, over eight months after the Performance Indemnity and Performance Counter–Indemnity were executed. The Tax Indemnity Agreement's stated purpose was to indemnify the purchasers of the SEGS against "the loss of any specified Federal income tax benefits." This agreement repeatedly refers to the Tax Indemnity agreement and tax losses, but makes no mention of a Performance Warranty or Performance Indemnity. Furthermore, Section 13 of the Tax Indemnity Agreement notes that "no payment made pursuant to this Agreement shall be subject to any right of setoff, counterclaim, defense, abatement, suspension, deferment or reduction. . . ."

The Tax Counter–Indemnity Agreement was entered into for the benefit of "those Underwriters at Lloyd's, London and those insurance companies ('Underwriters') who have subscribed to the Tax Indemnity. . . ." The Tax Counter–Indemnity Agreement also provided for the creation of the Tax Cash Collateral Account with a security interest in

favor of USL II, the nominee of the Appellees. However, the Tax Counter–Indemnity Agreement does not refer to any of the Performance agreements.

Upon review of the record, we hold that the Performance and Tax agreements did not constitute two components of one complete transaction allowing for cross-collateralization of the accounts. There is no provision in either set of agreements that refers to the other's existence. There is also no provision that allows for a loss incurred under one indemnity agreement to be set off against the Cash Collateral Account of the other. Furthermore, the eight-month time difference between the execution of the Performance and Tax agreements is further evidence that these agreements were not one integrated transaction but were separate indemnity policies. The mere fact that the Appellees subscribed as underwriters to both the Performance and Tax Agreements does not require the inference of cross-collateralization.[5] Therefore, we hold that the agreements were not intended to cross-collateralize the Debtor's obligations under both sets of indemnity agreements. As such, the bankruptcy court erred in holding that the Appellees satisfied the "same party" requirement of mutuality.[6]

### c. The parties are standing in the same capacity.

The final requirement of setoff is that the parties are standing in the "same capacity." In re County of Orange, 183 B.R. 609, 616 (Bankr.C.D.Cal.1995) (citing In re Visiting Home Servs., Inc., 643 F.2d 1356, 1360 (9th Cir.1981)). Courts construing this requirement have generally held that the concept of

5. We also note that Appellees' contention that these policies were simply parts of one overall transaction is difficult to reconcile with the fact that the Tax and Performance warranties were insuring against two very different types of risk—one relating to the mechanical performance of the SEGS themselves, the other relating to governmental tax treatment which is subject to legislative change. For Appellees to claim that, as "insurers" of both policies, Appellees can offset losses sustained on the Performance Policies against the unrelated cash collateral of the Tax Policies would allow the Appellees to unilaterally increase the amount of money securing the Performance policies by the amount held in the Tax

Cash Collateral Account. There is no indication whatsoever in the record that the parties intended this result.

6. As a final note, we also have concerns as to whether the Appellees are attempting to set off a joint liability on the part of the insurers against a debt owed, by the Appellees own admission, to only some of the joint partners. This would seem to be an impermissible attempt to set off a joint liability against a single debt. 5 Collier, at 553–39; 3 Norton Bankruptcy Law and Practice 2d § 63:5, 63–26 (1994), and cases cited therein. However, we need not reach this issue.

"capacity" refers to the nature of the relationship between the parties. 5 *Collier*, at 553–32. Thus, where a debt arises from a fiduciary duty or is in the nature of a trust, courts have held that there is no mutuality for setoff purposes. *See Western Dealer Management, Inc. v. England (In re Bob Richards Chrysler–Plymouth Corp., Inc.)*, 473 F.2d 262 (9th Cir.), *cert. denied*, 412 U.S. 919, 93 S.Ct. 2735, 37 L.Ed.2d 145 (1973).

In 1881 the United States Supreme Court expressed the rationale for this rule in the case of *Libby v. Hopkins*, 104 U.S. 303, 308, 26 L.Ed. 769 (1881). In *Libby* the Court discussed the issue of allowing a trustee to set off a debt owed to the debtor on account of the trustee's fiduciary duty against a claim that the trustee had personally against the debtor. The Court ruled that allowing such a set off would "permit a trustee to better his condition by a refusal to execute a trust which he had assumed." *Id.* In other words, "setoff will not be permitted where granting it would have the effect of excusing or evading the [fiduciary] obligation." 5 *Collier*, at 553–35.

In the present case there is no evidence in the record before us as to the existence, or lack thereof, of a fiduciary obligation on the part of the Appellees. Therefore, we are unable to express an opinion as to whether the parties meet the "same capacity" requirement for mutuality.

### V. CONCLUSION

Given the complexity of the financial arrangements, the fact that the relief sought by Appellees required a third party to the proceedings to release funds to the prevailing party, and the accelerated hearing schedule for a motion for relief from stay, in this case, it was error for the bankruptcy court to make a final adjudication of the Appellees' right to setoff in the context of a motion for relief from the automatic stay.

Notwithstanding the bankruptcy court's procedural error, the parties to this appeal have extensively argued their relative positions on the substantive setoff motion. This panel holds that the bankruptcy court also erred substantively in concluding that Appellees were entitled to setoff. The bankruptcy

court improperly concluded that the Appellees owed a debt to the Debtor for purposes of setoff under § 553. The Appellees merely held a security interest in money owned by the Debtor and held by Security Trust, a third party. The Appellees' duty to write a letter to the Security Trust, informing Security Trust of the expiration of Appellees' security interest in the account, does not rise to the level of a "right to payment" owing from the Appellees to the Debtor.

Moreover, the bankruptcy court erred in concluding that the debts were "mutual" within the meaning of § 553. The Appellees did not owe the Debtor a debt, nor were the debts owed between the same parties.

For the foregoing reasons, we **REVERSE** the decision of the bankruptcy court and **REMAND** for further proceedings consistent with this opinion.